D. A. McGEE AND OTHERS v.
BREEZY POINT ESTATES AND OTHERS.
ERNEST V. KLOPP AND ANOTHER, RESPONDENTS.

166 N. W. (2d) 81.

March 7, 1969—No. 41220.

*John R. O'Keefe* and *David K. Hackley,* for appellants.

*Carlsen, Greiner & Law,* for respondents.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Rogosheske, JJ.

NELSON, JUSTICE.

Appeal from an order of the District Court of Crow Wing County denying plaintiffs' motion for amended findings or a new trial and from the judgment in an action in which plaintiffs among other things sought to recover damages from defendants-respondents for the alleged wrongful delivery of a deed.

The several issues involved may be stated as follows: Did defendants-respondents, Ernest V. Klopp and Fidelity Bank and Trust Company, as escrow agents, perform their obligations to plaintiffs-appellants relative to the holding and releasing of a deed to real estate owned by plaintiffs? Did one S. B. Robinson acting in behalf of plaintiffs have actual or implied authority from plaintiffs to modify the terms of an escrow agreement between plaintiffs and respondents? Did respondents breach

any duty to plaintiffs by failing to make disclosures, and, if so, were plaintiffs damaged by reason thereof? Did plaintiffs, by affirming their contract for deed with defendant Breezy Point Estates and suing for the contract price, waive any remedies they may have had against respondents for the alleged wrongful delivery of the deed?

If all conflicts in the evidence are resolved in favor of the prevailing parties below, the facts appear to be as follows: Plaintiffs own certain acreage (herein referred to as the Markham property) situated on Pelican Lake, Crow Wing County, near what is known as the Breezy Point Complex. At the times herein material, the reasonable value of the Markham property, including buildings and furnishings, was $45,000. Plaintiffs had over the years spent considerable time in the Brainerd area and some of them were there during the summers of 1964 and 1965. A close associate of plaintiffs, one Robert Kerr, Jr., also maintained a summer home in that area, spending considerable time there during the summers of 1964 and 1965. He was an attorney whose law firm did work for Kerr-McGee Oil Industries, Inc., of which plaintiff D. A. McGee was president. The record also indicates that plaintiffs had a great many friends in the Brainerd area.

During the summer of 1964 plaintiffs negotiated the sale of the Markham property to Breezy Point Estates, named as a defendant herein, a partnership consisting of Don Eastvold, Ginny Simms Eastvold, and Jerome D. Lenz. The sale price was $80,000, payable in monthly installments of $960 each, with a balloon payment at the end of 8 years. Breezy Point Estates agreed to assign to plaintiffs for the purchase price the proceeds of "land contracts" made by it (for the sale of lots) having a total unpaid principal balance of not less than $80,000 and to deliver such contracts to respondents to hold in escrow. Payments on the contracts were guaranteed by Breezy Point, which further agreed in the event any contract became in default for 90 days or more to substitute for the delinquent contract a current contract with an unpaid principal balance at least equal to the balance due on the delinquent contract. It appears that the basic draft of the agreement between plaintiffs and Breezy Point Estates was prepared by Robert Kerr, Jr., in July or August 1964.

In the fall of 1964 Don Eastvold brought Mr. and Mrs. Baird H. Markham to respondent Fidelity Bank and Trust Company and introduced them to respondent Klopp. Klopp was introduced by Eastvold as "his banker," and Eastvold also said that Fidelity was "where he borrowed all his money." At this meeting Klopp assisted in the preparation of a bill of sale from the Markhams to Breezy Point Estates covering personal property to be included in the transaction between plaintiffs and Breezy Point. At the latter's request the closing of the transaction was deferred so that the partnership could accumulate the land contracts required under the contemplated real estate purchase contract. A part of the business conducted by Breezy Point was the acquisition of land, platting of the same, and selling of the lots. Some of the lots were sold for cash but the majority were sold on installment contracts which were not recordable because they did not provide for witnesses or acknowledgments. Most contained a specific agreement by the buyers not to record them.

In August 1964 Breezy Point established a banking relationship with respondent Fidelity. In the course of this relationship Fidelity purchased from Breezy Point approximately $750,000 in contracts for deed arising from the sale of condominium units by Breezy Point. In addition to these transactions Fidelity established a $300,000 line of credit for Breezy Point. Any loans made against the line of credit were secured by a pledge of $300,000 in life insurance on the life of Don Eastvold, the personal guaranties of the partners, the collateral assignment of approximately $140,000 in certificates of deposit derived from the purchase of the condominiums, and the assignment of contracts for the sale of lots. On September 23, 1964, Breezy Point had borrowed against its credit line a total of $185,000 and by early February 1965 had reached the full limit of $300,000. Its indebtedness remained at that figure until July 1965 when the balance began to be reduced. During the period from February 1965 to June 1965, payments received by Fidelity on contracts pledged to it were used first to pay the interest on the $300,000 indebtedness, the balance being deposited in Breezy Point's checking account.

Fidelity requested that the contracts for sale of lots assigned to it as

security for its loans to Breezy Point be accompanied by assignments of the contracts, quitclaim deeds covering the property running in favor of Fidelity, and warranty deeds from Breezy Point to the contract vendees. A majority of the contracts held by Fidelity were accompanied by these instruments, although some contracts were held without them. It appears that the sales success of the partnership frequently exceeded the surveyor's ability to plat; consequently, many sales were made without definite legal descriptions, which were furnished at a later date. Many vendees purchased lots on such a basis and made regular monthly payments. Many of the contracts which did not contain a legal description were handled by Fidelity as collection items. These were regarded as security for Breezy Point's indebtedness to Fidelity.

Shortly after the Markhams' initial visit to Fidelity, Mr. Markham telephoned Klopp and stated he had discussed the matter of the sale with plaintiff D. A. McGee and that one S. B. Robinson would be getting in touch with him. In the middle of October 1964 Klopp received his first telephone call from Robinson and thereafter all contacts and negotiations were with Robinson, whose authority therefore is an important issue in this case. Robinson was employed by Kerr-McGee as administrative assistant to the president, plaintiff D. A. McGee. Robinson had been with that corporation for 21 years and described his duties as "general duties with Kerr-McGee, and special assignments from Mr. McGee." His duties occasionally required him to perform certain tasks for McGee in his personal affairs.

In ensuing telephone conversations and correspondence extending into the spring of 1965, Robinson negotiated with Fidelity through Klopp the basis on which Fidelity would act as servicing agent for the collection of sums to be assigned to plaintiffs from the land contracts to be furnished under the real estate purchase contract and the basis on which the bank would act as escrow agent for the warranty deed to the Markham property.

It appears that the final agreement between Breezy Point and plaintiffs was set forth in a contract for deed dated March 10, 1965. By a letter April 12, 1965, Robinson transmitted a copy of the contract to Fidelity together with the executed warranty deed from plaintiffs to

Breezy Point Estates. The real estate purchase contract designated Fidelity as the escrow agent for the purposes of holding the contracts to be furnished by Breezy Point as collateral; collecting and disbursing their proceeds; and holding and delivering the warranty deed from plaintiffs to Breezy Point. Fidelity, however, was not a signatory to the contract. It did not want to be a party to the real estate purchase contract in the form submitted and therefore subsequently prepared a proposed escrow service agreement which was transmitted to Robinson April 15, 1965. Upon receipt Robinson reviewed the proposed agreement with McGee and then with plaintiffs' attorneys. The agreement was then redrafted by plaintiffs into the form in which it was eventually executed.

The real estate purchase contract provided for a closing date of May 15, 1965. Although the contract referred to the land contracts Breezy Point was to deliver as those contracts "enumerated in Exhibit 'A' attached hereto," there was no Exhibit "A." The real estate purchase contract did not specify the type of contracts which were to be placed in escrow. What plaintiffs were interested in was $80,000 in unpaid principal balances of contracts not delinquent more than 90 days. Robinson "assumed" that Breezy Point would not come forth with $80,000 in new contracts at one time, but would acquire them in some manner, and that when it furnished the contracts in that amount Fidelity would accumulate them in a portfolio for plaintiffs and would deliver their warranty deed to Breezy Point. From telephone conversations and correspondence, Robinson was aware that Fidelity was servicing Breezy Point's contracts for the sale of land for others also. He made no inquiry as to whether Breezy Point was indebted to Fidelity.

Plaintiffs, however, were not concerned with the contracts per se. The record indicates they looked upon the contracts as collateral and wanted to assume no liability or obligations in connection with them. Plaintiffs desired merely an assignment of proceeds (as opposed to an assignment of contracts) and that warranty deeds from Breezy Point to the vendees of the contracts be also placed in escrow. Fidelity under its servicing agreement was not obligated to verify the accuracy or genuineness of any contract for sale of lots. Plaintiffs established no

procedure to check out the contracts. Apparently they made no investigation of Breezy Point or its property prior to their contractual undertaking. Robinson knew of no such investigation nor had he ever seen any credit report concerning the partnership.

The deed conveying the Markham property to Breezy Point was released by respondents on June 8, 1965, following a long-distance telephone conversation the previous day between Robinson and Klopp. The testimony is in conflict concerning the contents of this conversation. Plaintiffs contend that Robinson was told that Fidelity had in hand $80,000 worth of "contracts necessary to complete the deal and assign the contracts." Klopp, on the other hand, contends that during this 4- or 5-minutes conversation he told Robinson that Breezy Point "would like to complete the purchase of the property" and that the contracts were not in hand but would be delivered by Breezy Point before the end of the month, and that Robinson then told him to "complete the transaction."

By letter dated June 29, 1965, Breezy Point directed Fidelity to place certain specified contracts in plaintiffs' portfolio to meet the requirement of the real estate contract. The collateral contracts were transferred to portfolio July 6, 1965, the first business day that Klopp was in the bank following the first of July. By letter dated July 16, 1965, Klopp advised Robinson that the transaction was completed and that $80,102.56 in unpaid contracts was now in plaintiffs' portfolio. He enclosed a list of contracts. Pursuant to request Robinson was provided, under date of August 6, 1965, with copies of the ledger cards on each of the contracts in plaintiffs' portfolio. The cards contained all of the pertinent information then available to Fidelity. Fidelity continued servicing the contracts for plaintiffs and at the date of trial held for plaintiffs' benefit $15,017.02.

It appears that the first time Fidelity became aware that Breezy Point faced possible financial difficulty was in July 1965, at which time, as a precautionary measure, Fidelity began to record the quitclaim deeds it had in its favor covering contracts for the sale of lots which had been assigned to it. In early August Klopp advised Robinson of rumors he had heard about Breezy Point's failure to pay bills. Again by

letter, dated August 13, 1965, Klopp advised Robinson that Breezy Point was in financial difficulty.

In December 1965, an involuntary petition in bankruptcy was filed against Breezy Point in the United States District Court at Duluth and in May 1966 it was adjudicated bankrupt. The percentage of delinquencies on the contracts in plaintiffs' portfolio was less than in Fidelity's own portfolio.

The real estate purchase contract gave plaintiffs the right to accelerate the unpaid balance on the contract in the event of default by Breezy Point. On or about August 19, 1965, plaintiffs exercised this option and commenced this action. In substitute pleadings submitted by present counsel for plaintiffs in the late fall of 1965, the acceleration of the unpaid balance was specifically reaffirmed.

Plaintiffs contend on appeal that the documents delivered by Breezy Point to Fidelity and Klopp, either before or after delivery of the deed, did not conform to the requirements made preceding its release — that, although purporting to be 24 contracts between Breezy Point and individual vendees, the documents contained no legal description; they were not recordable; they were not accompanied by duly executed and acknowledged warranty deeds or acknowledged assignments of the contracts for deed; and, at least in the majority of cases, the contracts themselves were not acknowledged nor duly executed. Plaintiffs also contend that of the $80,000 of "contracts" which Fidelity assigned to plaintiffs' portfolio the majority, both in dollar value and in number, were assigned from among contracts previously held by the bank for its own account. The contracts retained by Fidelity were, in most cases, accompanied by duly executed and acknowledged assignments and warranty deeds, complete with legal descriptions, and were in fact recorded by Fidelity in July 1965 to secure its own interests.

Plaintiffs further contend that on June 8, 1965, when plaintiffs' deed was delivered to Breezy Point, nothing had been received by Fidelity from Breezy Point — neither contracts, assignments, nor warranty deeds. Plaintiffs admit that there is a conflict in the testimony concerning the contents of the long-distance telephone conversation between Klopp and Robinson the preceding day, but insist that Robinson was then told

that Fidelity had in hand $80,000 worth of the "contracts necessary to complete the deal and assign the contracts."

Plaintiffs further contend that the record is devoid of any testimony, even by Klopp, indicating that plaintiffs or anyone in their behalf had, prior to June 8, 1965, any knowledge or even any intimation that the contracts delivered by Breezy Point did not and would not meet the requirements of the purchase agreement and were, in the opinion of Klopp as an experienced mortgage banker, unenforceable as against their vendees and unrecordable. Plaintiffs also contend that the record is devoid of any communication of these facts to plaintiffs after June 8, 1965, and prior to the commencement of this litigation; and that Klopp specifically represented to plaintiffs that "[t]here are warranty deeds available to the purchasers at the time that these contracts are paid in full." They further claim that the record is devoid of any communication by respondents of the fact — which was well known to them — that Breezy Point Estates had had working-capital problems as far back as 1964 which might, and ultimately did, result in the downfall of the entire operation.

Fidelity and Klopp admit being aware of the contract between plaintiffs and Breezy Point. Nevertheless, Fidelity was not a signatory to that contract, did not participate in its negotiation or drafting, and did not consent to operate thereunder. Instead, Fidelity entered into the escrow service agreement with plaintiffs dated April 22, 1965, which provided that it agreed to receive "executed land contracts representing purported sales of lots by Breezy to sundry purchasers * * * to secure payment of Buyer's indebtedness to Seller in the principal sum of $80,000 under the aforesaid Real Estate Purchase Contract" and that "Breezy's interest in said contracts, have been or will be assigned to D. A. McGee as in said Real Estate Purchase Contract provided." That contract provided that proceeds of the collateral contracts would be assigned as opposed to the assignment of the actual contracts themselves. It is the position of Fidelity and Klopp that plaintiffs through their agent modified the escrow arrangement by directing them to release the deed prior to the receipt of the contracts or by acquiescing in such delivery after it had been made; that they fully performed their duties to plaintiffs; and

that even if it were to be assumed the delivery had been wrongful, plaintiffs subsequently ratified it.

■ The trial court specifically found that Fidelity and Klopp faithfully performed their obligations under the escrow agreement. It determined that respondents were not guilty of negligence or fraud in the delivery of the deed prior to receipt of the collateral contracts and that on July 16, 1965, respondents did set aside from Fidelity's portfolio $80,102.56 in contracts and were holding the proceeds therefrom for plaintiffs. The court ordered Fidelity to deliver such proceeds, which on April 1, 1967, amounted to $15,017.02, to plaintiffs. The court found that the delivery of the deed was not simultaneous with the acquisition of the contracts but that plaintiffs could not claim prejudice since they acquiesced in the modification of the escrow agreement to permit delivery of the deed prior to receipt by Fidelity of the contracts, whether by agreement of their agent prior to delivery or their ratification of it afterward. The record herein sustains these determinations.

The trial court indicated that all of the parties to the transaction were subjected to fraudulent activity by Breezy Point. A review of the provisions of the contract between Breezy Point Estates and plaintiffs clearly demonstrates how easy plaintiffs made it for Breezy Point to carry on such activity. The agreements and the correspondence show that plaintiffs did not specify any standard as to the form of the contracts to be placed in escrow. It was not required that they be recordable or even enforceable, and plaintiffs were or should have been fully as aware of these facts as Fidelity and Klopp. In the light of the long period of negotiations between plaintiffs and Breezy Point, they knew or should have known the form of contracts used by Breezy Point. Furthermore, they either knew or should have known that many of the sales of property by Breezy Point were made at times when plats were in the preparation stage, with lot, block, and addition designations being then unascertainable.

There were no requirements in the separate escrow agreement that Fidelity and Klopp should verify the accuracy of any information relating to the contracts. They had not been made responsible for insufficiencies of legal descriptions nor for the form of the contracts. The

record is clear that on July 6, 1965, Fidelity completed the transfer of these contracts to plaintiffs' account. No agreement or correspondence between plaintiffs and respondents designated a formal assignment of the contracts as a requirement. The trial court in its memorandum pointed out that while there was not a formal assignment plaintiffs sustained no loss by reason of that fact.

Plaintiffs have complained that Fidelity and Klopp did not obtain from Breezy Point warranty deeds running in favor of the various contract purchasers. Plaintiffs' position apparently is that the warranty deeds were necessary so that upon payment of the purchase price by a vendee a deed of conveyance could be delivered to him, thus eliminating the danger of demands for the refund of monies collected by plaintiffs. However, obtaining such deeds was not an obligation respondents were required to meet as a condition for releasing plaintiffs' deed.

It is reasonable to conclude from the record that plaintiffs wanted nothing to do with the contracts themselves but were merely interested in them as security for the underlying indebtedness of Breezy Point to plaintiffs. They did not want to put themselves in a position where they would have to perform under the contracts and for that reason they did not want the contracts assigned to them. Nor did they want underlying legal title to the properties covered by the contracts, very likely because they had established no procedure to determine their validity or whether Breezy Point had in fact the underlying title and would be in a position to convey title to the vendees. There is nothing to indicate that plaintiffs conducted any investigation of Breezy Point's financial condition. Nor did they provide themselves with any right to inspect, accept, or reject, or in any manner protect themselves with respect to the quality of the contracts to be placed in escrow as security by Breezy Point.

Plaintiffs have cited Citizens Nat. Bank v. Davisson, 229 U. S. 212, 33 S. Ct. 625, 57 L. ed. 1153, as controlling in their favor. We do not find it controlling because here, unlike that case, there was a complete agreement between plaintiffs and respondents which respondents performed. Moreover, as has already been pointed out, a premature delivery

could not have resulted in detriment to plaintiffs since, as found by the trial court, the required contracts were deposited.

■ Clearly the requirement in the real estate purchase contract that Breezy Point deliver to the escrow agent as a condition of obtaining the deed for the Markham property $80,000 in contracts for the sale of real estate, assign the proceeds thereof, and place in escrow warranty deeds running from the vendor to the vendees was a condition for the sole benefit of plaintiffs. This condition could be waived by them. See, Tharaldson v. Everts, 87 Minn. 168, 91 N. W. 467. And modifications of conditions in an escrow agreement can be oral. Malley v. Quinn, 132 Minn. 254, 156 N. W. 263. As the trial court stated in its memorandum, Robinson acquiesced in such delivery after it had taken place if not before.

■ In claiming a wrongful delivery, plaintiffs necessarily deny the authority of their agent, Robinson. It was their burden to establish that claim, but the evidence supports the trial court's finding that Robinson was the duly appointed agent to act for and represent plaintiffs in their dealings with Fidelity. It is undisputed in the record that, after Klopp's first meeting with plaintiff Baird H. Markham, Markham advised him that Robinson would be in touch with Klopp and that thereafter all contacts, correspondence, and telephone calls were with Robinson. He negotiated with Fidelity and Klopp the escrow service agreement. Upon plaintiffs' receipt of the suggested draft of the escrow agreement from Klopp, Robinson discussed the draft with D. A. McGee and then with plaintiffs' attorneys. Clearly at no time were respondents advised by plaintiffs or anyone that Robinson did not have the power and authority to speak or negotiate for plaintiffs. His correspondence with respondents indicated that copies were sent to Markham. In that correspondence Robinson used the pronoun "we" when referring to the sellers. Robinson's testimony at the trial did not in any manner negate the authority the trial court found he had. And it is significant that none of plaintiffs appeared at the trial to testify that he lacked authority and was not their agent in this matter.

If Robinson did not have actual authority, he was clearly clothed with apparent authority. This being so, plaintiffs are bound by his

commitments. The general rule is that a principal is bound not only by the agent's actual authority but also by that which the principal has apparently delegated to him. See, 3 Am. Jur. (2d) Agency, § 73. An agent's apparent authority results from statements, conduct, lack of ordinary care, or other manifestations of the principal's consent, whereby third persons are justified in believing that the agent is acting within his authority. Therefore, the scope of apparent authority is determined not only by what the principal knows and acquiesces in, but also by what the principal should, in the exercise of ordinary care and prudence, know his agent is doing.

Thus, if a principal acts or conducts his business, either intentionally or through negligence, or fails to disapprove of the agent's acts or course of action so as to lead the public to believe that his agent possesses authority to act or contract in the name of the principal, the principal is bound by the acts of the agent within the scope of his apparent authority as to persons who have reasonable grounds to believe that the agent has such authority and in good faith deal with him. 3 Am. Jur. (2d) Agency, § 74.

Certainly plaintiffs knew, or in the exercise of ordinary care and reasonable prudence should have known, that Robinson was conducting negotiations on their behalf with Fidelity and Klopp. It cannot be said that respondents, under the facts of this case, should have inquired of plaintiffs the extent and nature of Robinson's authority or that they were negligent in not doing so and dealt with Robinson at their peril. Plaintiff Baird Markham told Fidelity and Klopp that Robinson would contact them and nothing further was heard from that plaintiff. There is every indication that Robinson was in a position of confidence, trust, and responsibility as to the other plaintiffs. As noted before, this is significantly shown by Robinson's correspondence with respondents, in which he continually used the word "we" when referring to the sellers. Plaintiffs are brought within the rule that if the principal has by voluntary act placed an agent in such a situation that a person of ordinary prudence is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption,

the principal is estopped as against such third persons from denying the agent's authority.

A review of the record makes it clear that the actual contract and terms for holding plaintiffs' warranty deed to Breezy Point were negotiated by plaintiffs, not directly, but rather through Robinson. If Robinson had authority to negotiate with respondents in the first instance, would not they be justified in assuming that Robinson had authority to subsequently modify or amend the terms of the contract he negotiated? Thus, if Robinson did not have actual authority, clearly upon the record herein he had apparent authority to modify the contract and could authorize respondents, as they claim he did, to release the deed without first acquiring possession of the contracts serving as security for Breezy Point's indebtedness.

Eberlein v. Stockyards Mortgage & Trust Co. 164 Minn. 323, 204 N. W. 961, relied upon and cited by plaintiffs, is distinguishable upon its facts. In that case the trial court found there was neither express nor implied authority. In the instant case the trial court properly found that Robinson had authority to act for plaintiffs at all times.

Plaintiffs have argued here that certain material facts were known to Fidelity and Klopp but unknown to Robinson and that by reason thereof Robinson could not authorize the release of the deed before the contracts were in respondent's possession. They argue further that Robinson did not know the nature of the "contracts" which would be subsequently delivered or assigned by Breezy Point to plaintiffs' portfolio. The record is clear that neither did Fidelity or Klopp. Breezy Point could have delivered to the bank $80,000 in new contracts not then in possession of the bank or it could have assigned or requested the bank to release $80,000 in contracts with complete legal descriptions. Where the contracts would come from or what specific contracts they would be was as unknown to respondents as it was to Robinson.

■ Plaintiffs claim respondents had the duty to disclose material facts concerning Breezy Point's ability to perform the real estate purchase contract. They point to Klopp's opinion that the contracts furnished for security were worth not more than $.50 on the dollar and complain that such opinion had not been communicated to Robinson or to

plaintiffs. The record indicates that Klopp had advised Robinson in a telephone conversation that he thought plaintiffs were "crazy" for selling their property on the basis they were. Certainly the record fully indicates that plaintiffs were personally acquainted and familiar with the Breezy Point area and we assume that if they had chosen to testify they would have been forced to admit that they were acquainted with the operations of Breezy Point Estates. Since they had negotiated their deal with Breezy Point on a mutually satisfactory basis, it would certainly not be proper for Fidelity and Klopp to offer unsolicited opinions or to interfere with the bargain which had been agreed upon prior to respondents' entry on the scene.

The trial court found that Fidelity did notify plaintiffs on August 13, 1965, that Breezy Point was in jeopardy. Respondents now contend that such notification was gratuitous since none of the contractual documents required them to investigate or keep tabs upon the financial condition of Breezy Point. We agree. Viewing the record, we find no breach of duty by respondents' failure to make disclosures concerning Breezy Point's ability to perform the real estate purchase agreement. Fidelity and Klopp first became involved with Breezy Point in August 1964, which was after plaintiffs had negotiated the terms of the real estate purchase agreement (although the written contract was not executed until the following spring). Nothing in the record would justify a conclusion that plaintiffs at any time relied upon respondents to disclose facts or rumors about Breezy Point. Certainly prior to May 1965, when the escrow agreement was made, respondents had no obligation to make disclosures relative to the business activities of Breezy Point Estates. Neither does the record establish that they were obligated to report to plaintiffs on the liabilities of Breezy Point Estates thereafter.

■ The contention that plaintiffs, by affirming their contract with Breezy Point and suing for the contract price, waived any remedies they may have had, if any, against respondents for an alleged wrongful delivery of the deed under the separate escrow agreement is clearly correct. As pointed out by the trial court, plaintiffs' acceleration of the indebtedness constituted an affirmance of the contract and the delivery of the deed. Plaintiffs cannot affirm and disaffirm the same delivery.

See, Olson v. N. P. Ry. Co. 126 Minn. 229, 148 N. W. 67, L. R. A. 1915F, 962.

The actions of plaintiffs throughout indicate that they placed principal reliance on the financial worth of Breezy Point, its integrity, and that of its individual partners. This is most evident from the fact that at no time did they examine or evaluate the security they were to receive nor did they require that security be in a form which they could enforce or protect.

Affirmed.

OTIS, JUSTICE (concurring specially).

I concur in the result.