**AMERICAN AIRLINES, INC.,
Plaintiff-Appellant,**

v.

**REMIS INDUSTRIES, INC., Defendant-Appellee.**

**No. 568, Docket 73–1960.**

United States Court of Appeals, Second Circuit.

Argued Feb. 27, 1974.

Decided March 15, 1974.

Paul E. Konney, New York City (Jacob Oliver, New York City, and Debevoise, Plimpton, Lyons & Gates, New York City, of counsel), for plaintiff-appellant.

Richard L. Bond, New York City (Marshall, Bratter, Greene, Allison & Tucker, New York City, of counsel), for defendant-appellee.

Before KAUFMAN, Chief Judge, FEINBERG and MULLIGAN, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

The importance of the question presented on this appeal cannot be gauged by reference to the relatively small amount in controversy. Indeed, the more than fourteen thousand dollars of disputed liability arising from the unauthorized use of an executive's Air Travel Card, issued to Remis Industries, Inc., pales in significance when viewed in the light of the sums which may well depend on our determination of the ambit of statutory credit card protection afforded by the 1970 amendment to the Truth in Lending Act. Since we find that the credit card abuses which Congress sought to eliminate plague all cardholders without meaningful distinction, we decline to interpret Congress's enactment in a way that would sap the strength of the statutory safeguards it provided. It is our belief that by arbitrarily confining the scope of the Truth in Lending Act's application to a limited class of cardholders, we would undermine Congress's purpose to afford a broader and more meaningful protection to all who enter the credit card domain.

Remis Industries is a Massachusetts corporation engaged in the sale of hides and other equine by-products. Since 1943 its personnel have been using Air Travel Cards which, although issued in this instance by American Airlines, are accepted by all airlines for the purchase of tickets on credit. Remis entered into a "Universal Air Travel Plan Subscriber's Contract" with American and in May, 1971 forwarded a "Request for Travel Cards" form to American in New York. On May 19, American approved the renewal of its contract with Remis and soon thereafter issued new Air Travel Cards, including one for use by Abraham Lerner, Remis's Vice President and General Manager.

In August, 1971 Lerner received a call from a Royal Dutch Airlines representative informing him that there had been an error in the billing of six round-trip tickets from Miami to Curacao charged to his Air Travel Card on August 6. Since Lerner had not purchased these tickets, he immediately realized that his Air Travel Card had either been lost or stolen. Because of this, he promptly notified American of the card's loss.

Much to Lerner's chagrin, he soon learned that airline tickets totaling $14,008.16 had been charged to his Air Travel Card during the period of its loss and prior to his notification of American. When American duly requested payment of this amount from Remis, the company refused to pay because the charges stemmed from an unauthorized use of the credit card.

American filed suit against Remis in February, 1972 in New York State Supreme Court. On March 6, 1972, Remis removed the action to United States District Court for the Southern District of New York on grounds of diversity, 28 U.S.C. § 1441. In its answer to the complaint, Remis contended that the amount in issue resulted from an unauthorized use of Lerner's Air Travel Card; that American was negligent in permitting the card's unauthorized use; and that, in any event, under either Massachusetts law or New York law, liability for the unauthorized use of a credit card was limited to $50.

With the issues joined, American moved for summary judgment. It argued that the "Universal Air Travel Plan Subscriber's Contract" signed by Remis obligated the company to pay for all tickets charged to its account prior to the receipt by American of notice that an Air Travel Card had been lost. The various affirmative defenses raised by Remis, American contended, were insufficient as a matter of law.

On August 8, 1972, in an opinion reported only in 4 CCH Cons.Cred.Guide ¶ 99,123, Judge Cannella denied the motion. Finding New York law to be applicable, he held that American had failed to comply with the conditions

precedent to the recovery of charges resulting from the unauthorized use of a credit card, limited in any case to $50, as contained in N.Y.G.B.L. § 512. Moreover, in so doing, Judge Cannella rejected American's assertion that § 512 was not applicable in this instance because that section, by its language, extends protection only so far as the federal Truth in Lending Act, 15 U.S.C. §§ 1601, et seq.—which in turn, argued American, does not apply to credit cards issued to corporations or to credit cards used for business or commercial purposes.

Following Judge Cannella's decision, the parties stipulated that his order would be considered as granting partial summary judgment to Remis dismissing the complaint in excess of $50, and that the balance of the claim would be voluntarily dismissed by American. On April 23, 1973, this stipulation was embodied in an order issued by Judge MacMahon and, with no claim remaining to be litigated, American appealed from the April 23rd order as a final order pursuant to 28 U.S.C. § 1291.

Although we cannot agree with the rationale of Judge Cannella's opinion, we believe his conclusion—that Remis's maximum liability for the unauthorized use of its Air Travel Card is $50—is correct. Accordingly, we affirm.

I

We begin by examining N.Y.G.B.L. § 512 upon which Judge Cannella relied as the exclusive determinant of Remis's potential liability.[1] That section states:

A provision which imposes liability upon a holder for a cash advance or loan or for the purchase or lease of property or services obtained by the unauthorized use of a credit card shall not be enforceable to the extent that it imposes a greater liability upon the holder than is imposed under the provisions of the act of Congress entitled "Truth in Lending Act" and the regulations thereunder, as such act and regulations may from time to time be amended.

McKinney's Cons.Laws of N.Y. Cumulative Pocket Suppl. for 1973–1974. The reference to the Truth in Lending Act is quite clear. Judge Cannella construed that reference as defining the dollar amount of maximum liability under New York law—$50, pursuant to § 133(a) of the Truth in Lending Act, 15 U.S.C. § 1643(a)—but not the scope of section 512's coverage. That, he concluded, was governed by the definitions contained in the New York Act, N.Y.G.B.L. § 511, which on their face include all credit card holders, natural persons as well as corporations, without exception.[2] Thus, without interpreting the range of the Truth in Lending Act as a whole, the district judge determined that § 512 imposed a liability limitation on the Air Travel Card issued to Remis. It is a well-settled principle of statutory construction that the plain language of a statute offers the primary guidance to its meaning. Indeed, the New York Court of Appeals has said:

[Where] the language found in the statute is clear and unambiguous, . . . the intent of the framers "is to be sought first of all, in the words and language employed, and if the words are free from ambiguity and doubt, and express plainly, clearly and

1. Since neither party disputes Judge Cannella's finding that New York law governs here, we have no occasion to examine the validity of that finding on this appeal.

2. "Holder" is defined in § 511(4) as:
a person to whom such a credit card is issued or who has agreed with the issuer to pay obligations arising from the use of a credit card issued to another person;
And, "person," in turn, § 511(2), as:
an individual, corporation, partnership or association, two or more persons having a joint or common interest or any other legal or commercial entity.

distinctly, the sense of the framers of the instrument, there is no occasion to resort to other means of interpretation." McCluskey v. Cromwell, 11 N. Y. 593, 601–602.

Meltzer v. Koenigsberg, 302 N.Y. 523, 525, 99 N.E.2d 679 (1951). *See also* Roosevelt Raceway v. Monaghan, 9 N.Y. 2d 293, 304, 213 N.Y.S.2d 729, 174 N.E. 2d 71 (1961); Daniman v. Board of Education, 306 N.Y. 532, 543, 119 N.E.2d 373 (1954). We believe that the clear language of § 512, by referring without qualification to the *"provisions* of the act of Congress entitled "Truth in Lending Act'," simply does not support the selective incorporation approach adopted below. Accordingly, although New York's statutory definitions are sufficiently broad to cover Remis, and the statutory predecessors of § 512 applied without distinction to corporate and individual credit card holders, we believe that the language of the present statute requires a determination of Remis's liability under the Truth in Lending Act. If New York intended a more restricted applicability of that Act, as Remis urges, it is for the New York legislature and not this Court to amend the statute.

## II

When the Truth in Lending Act, 15 U.S.C. §§ 1601 et seq. was enacted on May 29, 1968, it contained no reference to credit card transactions. Rather, its limited though important purpose was, in the words of the Act itself, "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601.

The statement of purpose reveals that Congress was focusing its attention on credit transactions involving the consumer—transactions "in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of

the transactions are primarily for personal, family, household, or agricultural purposes." 15 U.S.C. § 1602(h). Corporate debtors or individuals who secure credit for business or commercial purposes were thought to be amply sophisticated—that is, sufficiently able to satisfy the Act's goal of utilizing credit in an "informed" manner, 15 U.S.C. § 1601— so that mandatory disclosure requirements were not warranted for that genre of credit transaction. *See* Warren & Larmore, Truth in Lending: Problems of Coverage, 24 Stan.L.Rev. 793, 809– 810 (1972). And, in fact, the report of the Senate Committee on Banking and Currency states in pertinent part:

> Most businesses or corporations are in a good position to judge the relative worth of alternate credit plans and by and large do not require the special disclosure protections provided by the bill.

S.Rep. No. 392, 90th Cong., 1st Sess. 7 (1967). Accordingly, to implement this view, the Truth in Lending Act includes a provision, 15 U.S.C. § 1603, which reads, in relevant part:

> This subchapter does not apply to the following:
> (1) Credit transactions involving extensions of credit for business or commercial purposes, or . . . to organizations [defined to include corporations and partnerships].

Although the original Truth in Lending Act included no provisions governing the expanding world of credit card use, the House of Representatives, at least, had begun to examine this aspect of the credit field as early as 1967. In that year, Representative Wright Patman introduced the first bill, H.R. 12646, 90th Cong., 1st Sess. (1967), designed to regulate the mailing of unsolicited credit cards, and chaired the hearings before the House Committee on Banking and Currency on this subject. *See* Weistart, Consumer Protection in the Credit Card Industry: Federal Legislative Controls, 70 Mich.L.Rev. 1476,

1483–1485 (1972). The following year, the Senate commenced an investigation of the credit card field, the initial hearings beginning in October, 1968 before the Subcommittee on Financial Institutions of the Senate Committee on Banking and Currency, 90th Cong., 2d Sess. (1968). *Id.* at 1485–1486 n. 37. By 1970, these hearings bore fruit in the form of legislation, the purposes of which were threefold: (1), to prohibit the distribution of unsolicited credit cards; (2), to limit the liability of a cardholder for the unauthorized use of his card to $50; and (3), to make the fraudulent use of a credit card a crime punishable by a fine or imprisonment or both. For its own esoteric reasons, Congress enacted this legislation as an amendment to the Truth in Lending Act, adding definitional subsections, 15 U.S.C. §§ 1602(j–*o*), and substantive sections, 15 U.S.C. §§ 1642–1644.

Section 1643(a), of principal concern in this case, states, in pertinent part:

> A cardholder shall be liable for the unauthorized use of a credit card only if the card is an accepted credit card, the liability is not in excess of $50 . . ., and the unauthorized use occurs before the cardholder has notified the card issuer that an unauthorized use of the credit card has occurred or may occur as a result of loss, theft, or otherwise.

The term "cardholder" is broadly defined as "any person to whom a credit card is issued," 15 U.S.C. § 1602(m); with the term "person" defined in the Act's original definitions as "a natural person or an organization," 15 U.S.C. § 1602(d), and "organization" defined to include a corporation, 15 U.S.C. § 1602(c). Thus, upon putting together this definitional jigsaw puzzle, one finds that § 1643(a) protects all credit card holders—individual and corporate alike. Clearly, this would appear to limit Remis's liability from the unauthorized use of its Air Travel Card to $50.

American argues, however, that we must read § 1643(a), which after all was an amendment to the Truth in Lending Act, in the light of § 1603, the section to which we have already referred, which exempts from the Act's purview "credit transactions involving extensions of credit for business or commercial purposes, or . . . to organizations." American's brief accordingly urges that

> [S]ince it is beyond dispute that American extended credit to Remis Industries for business or commercial purposes, and that Remis Industries is a corporation, the exemption contained in section 104 of the Truth in Lending Act [15 U.S.C. § 1603] precludes Remis Industries from invoking the limitation of liability contained in section 133 [15 U.S.C. § 1643(a)].

American's argument founders not only on well-established principles of statutory construction but also on the uniform and contrary interpretation of the relationship between § 1603 and the 1970 credit card amendment voiced by both the Federal Reserve Board, *see* 37 Fed.Reg. 24339, and the Federal Trade Commission, *see* In re Credit Card Service Corp. d/b/a Credit Card Service Bureau, CCH Trade Reg.Rep. ¶ 20, 215 (Jan. 19, 1973), appeal docketed, No. 73–1357, D.C.Cir. (Apr. 6, 1973). The rule of statutory construction to which we turn in this instance has been enunciated as follows:

> [T]he provisions introduced by the amendatory act should be read together with the provisions of the original section that were . . . left unchanged, as if they had been originally enacted as one section. Effect is to be given to each part, and they are to be interpreted so they do not conflict. If the new provisions and the . . . . unchanged portions of the original section cannot be harmonized, the new provisions should prevail as the latest declaration of the legislative will.

1A J. Sutherland, Statutes and Statutory Construction, ¶ 22.34, p. 196 (4th ed. C. Sands 1972). We are of the view that by applying § 1603 to limit the scope of both the original disclosure provisions of the Truth in Lending Act and

the credit card provisions added in 1970, as American suggests, we would produce such statutory obfuscation that it would surely thwart the intent of Congress.[3] To avoid this cacophony, § 1603 cannot be construed as circumscribing the salutary protection afforded by the credit card amendment.

We note, for example, that application of § 1603 to § 1643(a) would raise a threshold question for which the Act at least provides no ready answer: at what point in the credit card process does a transaction involving the extension of credit occur? Since the likely response is at the time the credit card issues,[4] confusion would prevail over the classification of cards issued to natural persons. Were the cards issued for business or commercial use and thus excluded from protection, or were they for personal use and hence covered under § 1643(a)? To be sure, a predominant use test might provide a solution, *cf.* Brill v. Newport National Bank, 4 CCH Cons.Cred.Guide ¶ 99,057 (S.D.N.Y. 1973). But the extensive, overlapping use of some types of credit cards, e. g. to purchase gasoline or meals in a restaurant, would make this test wholly unwieldy in application.

In addition to producing needless uncertainty, engrafting the scope limitations of § 1603 upon the 1970 credit card provisions would replace the uniform safeguards demanded by the nature of the problems which Congress addressed with a crazy-quilt design of cardholder protection. The "deep pocket" theory might provide a superficial basis for distinguishing corporate from individual cardholders. But, more persuasive considerations, such as the preferential position of the card issuer to insure against the risk of card loss, *see* Weistart, *supra* at 1517, and the incapacity of corporations and individuals alike to prevent the unsolicited distribution of credit cards, suggest that Congress intended to protect all credit card holders without exception.

Nor do we find particularly cogent American's argument that, unlike consumers, corporations and individuals who use credit cards for business or commercial purposes do not need the statutory safeguard of limited liability for they are capable of apportioning the risk of loss by contract. Indeed, the facts here furnish a convincing answer to this contention. In order to obtain its Air Travel Cards, Remis was required to sign a contract entitled *"Universal Air Travel Plan Subscriber's Contract."* (emphasis added). It would not be illogical to presume, based on this appellation, that, in the case of Air Travel Cards and, we suspect, in the credit card field in general, bargaining is a rather euphemistic characterization of what is

---

3. No legislative history could be found to illuminate congressional intent with respect to the relationship, if any, between § 1603 and the 1970 credit card amendment. Appellant proffers two statements by Senator Proxmire, both uttered during hearings conducted more than one year following passage of the credit card legislation on a bill at best distantly related to the credit card provisions here in question, in which he suggests that further amendment of the Truth in Lending Act would be required to eliminate the applicability of § 1603 to the credit card provisions. *See* Hearings on S. 652 Before the Subcomm. on Banking, Housing and Urban Affairs, 92nd Cong., 1st Sess., at 78, 113 (1971). Suffice to say, as the Court did in United States v. Philadelphia National Bank, 374 U.S. 321, 348–349, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963) quoting United States

v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960):

> [T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.

4. The alternative would be at the time the credit card is used. Appellant can hardly find solace in this choice however, for it would then appear even more clearly that § 1603 does not apply to § 1643(a) since the unauthorized use of a credit card does not result in an extension of credit to the *"cardholder."* Thus, the exemptions contained in § 1603 would have no relevance to § 1643(a) —unless, of course, one must look to the *unauthorized* user to determine whether credit has been extended for business or commercial purposes as distinguished from personal needs.

essentially a take-it-or-leave-it method of contract formulation. Thus, any differential in bargaining power or sophistication among cardholders would appear to be effectively neutralized by the use of form contracts in lieu of negotiation.

Finally, a statutory construction limiting the applicability of the § 1603 exemptions to the Truth in Lending Act as originally enacted, is surely buttressed by the concurrence of both the Federal Reserve Board and the Federal Trade Commission in that interpretation. The Board, charged with prescribing regulations pursuant to the Act, 15 U.S.C. § 1604, amended its so-called "Regulation Z" to make explicit that the Act's protection extends to corporate cardholders as well as to cards issued for business or commercial purposes. 12 C.F.R. § 226.-13(a)(4) (1973) (amended Nov. 2, 1972). Although this amendment was adopted subsequent to the transaction at issue, the timing does not detract one whit from the relevance of the Board's views. The language of the amendment is precise in stating that the amendment's purpose was merely to clarify the existing statutory language. *See* 37 Fed.Reg. 24339 (1972). Similarly the Federal Trade Commission, the agency with primary enforcement responsibilities under the Truth in Lending Act, 15 U.S.C. § 1607, has also held that the Act's credit card provisions apply to all cardholders. In re Credit Card Service Corp. d/b/a Credit Card Service Bureau, *supra*. Since these administrative expressions concerning the Act's proper construction should be given great weight, Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 210, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), and especially so, where, as here, Congress delegated broad power to the supervising agencies, Mourning v. Family Publications Service, Inc., 411 U.S. 356, 371–373, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), we believe that any abstruseness caused by the Truth in Lending Act's ambiguities should be resolved in favor of these sound agency interpretations. Accord-

ingly, we hold that § 133(a) of the Truth in Lending Act, 15 U.S.C. § 1643(a), limiting liability exposure to $50 where the credit card use has been unauthorized, applies to all credit card holders. We therefore affirm.