Louis R. KOERNER, Sr., etc.

v.

The AMERICAN EXPRESS COMPANY.

Civ. A. No. 76–3660.

United States District Court,
E. D. Louisiana.

Dec. 8, 1977.

---

Louis R. Koerner, Jr., Stephen M. Bernstein, New Orleans, La., for plaintiff.

Peter Frank Liberto, Chaffe, McCall, Phillips, Toler & Sarpy, David L. Campbell, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for defendant.

## MEMORANDUM OPINION AND ORDER

EDWARD J. BOYLE, Sr., District Judge:

Invoking the court's jurisdiction pursuant to 15 U.S.C. § 1640(e), its counterparts 28 U.S.C. §§ 1331 and 1337, and the general diversity jurisdiction statute, 28 U.S.C. § 1332, plaintiff, Louis R. Koerner, Sr., seeks injunctive relief and damages for alleged violations by American Express, Inc. (American Express) of the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601 *et seq.* Plaintiff brings these claims on his own behalf and seeks to represent an alleged class of persons similarly situated. Pendant to the claims are plaintiff's demands for relief based on an alleged breach of duties imposed upon American Express by Louisiana law.

The defendant has filed a Motion for Summary Judgment dismissing the federal claims on the grounds that the statute claimed to have been violated, 15 U.S.C. § 1666, which deals with correction of billing errors, does not apply to transactions of a business or commercial nature and that holders of credit cards issued under a company account do not qualify as "consumers" as that term is defined in the TILA. The motion also seeks dismissal of the state claims on the grounds that they fail to meet the required jurisdictional amount. Following a hearing on the motion, a United States Magistrate rendered his report, recommending that the motion be granted on the basis that the instances of card usage which led to the alleged Truth in Lending violations were exempted from coverage by the Act and plaintiff, therefore, had failed to state a cause of action under the federal statute. Further, it was recommended that plaintiff's state claim, supportable only under diversity jurisdiction in the absence of a viable federal claim, be dismissed.[1] Plaintiff has filed timely objections to the recommendations of the Magistrate as they relate to the Truth in Lending claims, specifically asserting that the report failed to reconcile with its conclusions the case of *American Airlines, Inc. v. Remis Industries, Inc.*, 494 F.2d 196 (2 Cir. 1974). After considering the record, the memoranda of counsel in support of and opposition to plaintiff's objections to the Magistrate's Report and Recommendation, and the law applicable, we have concluded that said objections should be overruled and defendant's Motion for Summary Judgment dismissing plaintiff's complaint should be granted.

The pertinent facts, which are uncontested unless otherwise noted, are as follows:

1. On November 16, 1965, an application for a credit card was completed on a compa-

---

1. In conference, plaintiff stipulated that his state claim would not reach the requisite jurisdictional amount. (*See* ¶ B of Minute Entry dated March 30, 1977, Rec.Doc. # 16).

ny account form. It was signed by the company through one of its officers and by *John E.* Koerner, Jr., who was designated as an individual authorized to receive a card in the company name. Bank and credit references were requested of and supplied by the company only. According to the application, all billings were to go to the company at its office address. Following approval of the application, the company account was opened and the card issued.[2]

2. Also on November 16, 1965, a form labelled "Application for Supplementary Credit Card, Company Account" was completed by the company through one of its officers and by *Louis R.* Koerner, plaintiff herein. No additional bank or credit references were requested. The application was approved and the card was issued.[3]

3. Apparently, additional supplementary company cards were issued to *Ralph E.* Koerner, Dennis Thomas and Carroll A. DeGeorge. All cards, including those mentioned above, were embossed with the company name and the name of the individual cardholder.[4]

4. All charges for use of plaintiff's card, as well as other company cards, were billed to the company and statements of combined billing, showing subtotals by individual cards, were mailed to it at its business address.[5]

5. From the date of issuance of the supplementary card to plaintiff, he has remitted payment for a number of transactions with a total of seven personal checks. Payment for all other charges (excluding those currently disputed) was made by the company.[6]

6. A billing dispute arose over the following charges included on the combined billing statements sent to the company:[7]

(a) Three debits in the amount of $3.00 each and one debit in the amount of either $3.00 or $6.00 for charges made by plaintiff in July, August, September and October of 1975 for air flight insurance for trips conducted for business purposes.

(b) A debit of $20.00 representing, according to plaintiff, "a charge for Mr. John E. Koerner's card which was returned and for which credit was never given." This, presumably, was a renewal fee for a card no longer desired.

(c) A debit of $20.00, ultimately cancelled by a credit which plaintiff asserts was "a charge for a card of Ralph E. Koerner." The nature of the charge has not been established.

7. Although American Express communicated with the company regarding the alleged billing errors, the dispute remained unresolved on September 28, 1976. On that date, plaintiff was asked to speak by phone to a representative of American Express when he attempted to use his card for the purchase of an airline ticket at N.O. International Airport. Following conversation with the representative as requested, plaintiff was presented with his credit card cut in half. The purpose of the trip for which the ticket was to be purchased was business related.[8]

Plaintiff argues that this withdrawal was in violation of the creditor's obligations es-

---

2. *See* Exhibit 1 to defendant's Motion for Summary Judgment, Rec.Doc. # 6.

3. *See* Exhibit 2 to Motion for Summary Judgment, *supra.*

4. *See* Exhibit 3 to Motion for Summary Judgment, *supra.*

5. *See* ¶ 3, defendant's Statement of Uncontested Material Facts, appended to Motion for Summary Judgment, *supra,* admitted in ¶ 3 of plaintiff's Opposition to Statement of Uncontested Material Facts, appended to his opposition memorandum, Rec.Doc. # 10.

6. *See* ¶ 9 of plaintiff's Answers to Interrogatories, Rec.Doc. # 21.

7. *See* ¶¶ 3 through 9 of plaintiff's Answers to Interrogatories, *supra.*

8. See ¶¶ 9 through 13 of Complaint, Rec.Doc. # 1.

tablished by § 161 of the TILA, 15 U.S.C. § 1666, which was added on October 28, 1974,[9] and became effective one year later.[10] Section 1666 regulates the conduct of cardholders and card issuers, among other creditors, relating to possible billing errors. Plaintiff also alleges that defendant has violated § 127 of the Act, 15 U.S.C. § 1637, which requires that periodic disclosures be made by creditor, and which plaintiff asserts "is made applicable to American Express through § 1666." Therefore, plaintiff will be able to proceed to the merits of his Truth in Lending claims only upon a determination that § 1666 is applicable in the present situation.

*American Airlines, Inc. v. Remis Industries, Inc.,* supra, on which plaintiff relies as being controlling,[11] dealt not with the 1974 amendments to the TILA but with the 1970 amendments, the first provisions of the Act to deal with credit cards. The 1970 credit card provisions include § 132 (15 U.S.C. § 1642), which prohibits the unsolicited issuance of cards, § 133 (15 U.S.C. § 1643), which limits the liability of cardholders for fraudulent use of their cards, and § 134 (15 U.S.C. § 1644), which establishes penalties for fraudulent use. These provisions are implemented by the Federal Reserve Board, the agency given regulatory and advisory powers under the Act,[12] which has promulgated Regulation Z.[13]

Since its enactment in 1968, the TILA has provided for a "business use exemption."

The exemption is stated in § 104(1) of the Act, 15 U.S.C. § 1603(1), which reads:

> This title [15 U.S.C. § 1601 et seq.] does not apply to . . . [c]redit transactions involving extensions of credit for business or commercial purposes . . . .

The exemption is repeated in Regulation Z (12 C.F.R. § 226.3(a)). The history of the relationship between the exemption and the TILA's early credit card provisions is outlined in a letter from the Federal Reserve Board, which, in pertinent part, states:

> In administering [Regulation Z] staff at first interpreted [12 C.F.R. § 226.3(a)] to mean that credit cards used for business purposes were not subject to the provisions of § 226.13 . . . regarding issuance of credit cards and liability for unauthorized use. More extensive experience with the Act, however, indicated that the congressional intent and the purposes of the legislation would be better served by including such cards within the coverage of the section, and Regulation Z was amended on December 12, 1972, to include credit cards issued for business purposes (§ 226.13(a)(4), renumbered as 226.2(m) . . .).[14]

> In its annual reports to Congress, the Board recommended that the Truth in Lending Act be amended to reflect this interpretation of the credit card provisions. Public Law 93–495 enacted on October 28, 1974, gave effect to this recommendation in § 410 [15 U.S.C. § 1645],

---

**9.** P.L. 93–495 was enacted on October 28, 1974 and consists of six titles. Title III—Fair Credit Billing—amended various provisions of the Act and added to it, as Chapter 4—Credit Billing—sections 161 through 171 [15 U.S.C. §§ 1666–1666(j)]. While the name "Fair Credit Billing Act" is in fact the short title for all of Title III of P.L. 93–495, it is the name popularly given to Chapter 4 of the Truth in Lending Act. (*See* Historical Notes following text of § 1666 in 15 U.S.C.S.). Section 135, 15 U.S.C. § 1645, also discussed in this opinion, was added to the TILA as part of Title IV of the 1974 legislation.

**10.** § 308 of the TILA.

**11.** The narrow holding of *Remis* is that 15 U.S.C. § 1643(a), which establishes a $50 limi-

tation on cardholders' liability for fraudulent use of their cards, protects all credit card holders, individual and corporate alike.

**12.** 15 U.S.C. §§ 1604, 1607(d), 1608, 1609, 1613.

**13.** See 12 C.F.R. Part 226—Truth in Lending. Section 226.13 relates to credit card transactions.

**14.** 12 C.F.R. § 226.2(m) reads: " 'Cardholder' means any person [person is defined to include both natural persons and organizations in 12 C.F.R. § 226.2(bb)] to whom a credit card is issued for personal, family, household, agricultural, *business, or commercial purposes . . .*" (Emphasis ours).

which provides that the business purpose exemption of the Act does not apply to the credit card provisions. Therefore, a credit card issuer supplying cards to a company or its employees must comply with all relevant provisions of § 226.13 of Regulation Z. Federal Reserve Board Letter No. 898 of June 15, 1975 by Susan B. Collins, Attorney, Fair Credit Practices Section, *quoted in,* 5 CCH Consumer Credit Guide, ¶ 31,232.

On March 15, 1974, a time prior to the enactment of § 1645 which negates the operation of the § 1603 business use exemption in §§ 1642, 1643 and 1644, the opinion in *Remis,* supra, was rendered and provided a judicial pronouncement that § 1643(a)—limiting cardholders' liability for fraudulent use—applies to all cardholders, individual and corporate alike. Plaintiff's argument therein, that § 1603 excluded corporate cardholders from the protection afforded by § 1643, was rejected. The court viewed the argument as contrary to the uniform interpretation of the relationship between § 1603(1) and the 1970 credit card provisions voiced by the Federal Reserve Board and the Federal Trade Commission and out of harmony with the expanded definition of "cardholder" provided by § 226.2(m) of Regulation Z. Further, plaintiff's argument foundered on principles of statutory construction. The court found that it was all but impossible to superimpose on the liability limitation statute the transaction-by-transaction analytical approach embodied within the business use exemption and, additionally, discarded a "predominant use" test as "wholly unwielding in application." [15] Thus, in the face of a conflict between the two sections of the TILA § 1643, unencumbered by § 1603(1), prevailed as the latest expression of legislative will.[16]

The issue raised by the instant motion is phrased by the parties as whether or not

§ 1603(1) is applicable to § 1666. Plaintiff argues that § 1603(1) is no more capable of being given effect in the enforcement of the 1974 amendments, including § 1666, than it would have been in the administration of the 1970 amendments and therefore asserts that § 1666 applies to card issuers in all instances. Defendant argues that the absence of an abjurement of the applicability of § 1603(1) to § 1666, enacted as a part of the Act which created § 1645,[17] reveals congressional intent to allow § 1603(1) to operate with respect to § 1666 and thereby exclude all business transactions.

For reasons stated below, we find that § 1666 provides its own internal qualifications, generally extending its coverage to all transactions accomplished by means of a credit card issued to a natural person under a non-corporate account and excluding all others. Additionally, while we agree with *Remis* that a "purpose of use" test applied to each transaction is highly unsuited to the administration of credit card provisions and would similarly reject a "predominant use" test applied retrospectively at the litigation stage as an inadequate behavioral guide to card issuers and an unwieldy and inappropriate judicial tool, we cannot accept the implication in *Remis* that these approaches are the only ones available under § 1603(1). We find no conflict between the concurrent operation of the limitations imposed by §§ 1603(1) and 1666 and follow the rule of statutory construction stated in *Remis:*

> Effect is to be given to [provisions introduced by the amendatory act and those of the original section] . . . and they are to be interpreted so they do not conflict.

*Remis,* supra, at 200, and treatise cited therein.

At the outset, we note that the term "cardholder," expanded in 1972 to include corporate cardholders [18] is conspicuously absent within the confines of § 1666. Instead,

---

**15.** *American Airlines, Inc. v. Remis Industries, Inc., supra,* at 200–201.

**16.** *Id.*

**17.** *See* n. 2.

**18.** *See* n. 14.

the term "creditor," which is defined in 15 U.S.C. § 1602(f) to include card issuers,[19] in turn defined in § 1602(n) simply as any person or his agent who issues a credit card, is used throughout, with a correlative designation of the consumer as the "obligor." Section 1666(a) sets forth a scheme for the orderly resolution of disputes over the correctness of statements transmitted by creditor to obligor "of the obligor's account in connection with an extension of *consumer credit.*" (Emphasis ours.) Billing errors, as defined in § 1666(b), consist of computation errors, reflections of an extension of credit either not made to the obligor, not made in the amount shown for goods or services not accepted by or properly delivered to obligor, or for which additional clarification is needed, and any other error described in regulations of the Board.[20] Under § 1666(d), creditors "operating an open end consumer credit plan" may not restrict or close an account solely because of obligor's failure to pay an amount in dispute, prior to the sending of a written explanation or clarification as required by the statute. A penalty of forfeiture of any right to collect the contested amount is imposed on creditors by § 1666(c).

The qualification which serves to limit the obligations of card issuers under § 1666 is contained in the statute's stipulation in § 1666(a) that statements of account containing potential discrepancies be connected with an extension of credit that is consumer in nature. Under the TILA, an "extension of credit" may be viewed as occurring at two points: at the opening of the account and issuance of the first card thereunder, and at the consummation of transactions for goods or services through card usage.[21]

The term is used in both senses within § 1666. Subsections (1) and (2) of § 1666(b), which defines billing errors, unquestionably speak of individual, accomplished transactions as extensions of credit. However, the term as used in § 1666(a), which governs the scope of cardholders' obligations established therein, can only refer to the extension of credit which occurs when the right to incur debts and defer payment is created at the opening of the account. The statute, as it pertains to cardholders, obviously was not designed to proceed on a transaction-by-transaction basis. An error in computation, for example, also defined as a "billing error" in 1666(b), cannot always be attributed to a single transaction. Nor could the "consumer" or "non-consumer" nature of a charge made by a person other than cardholder but mistakenly billed to cardholder's account, again a "billing error," be relevant to the scope of coverage. Further, a charge for the renewal of a card no longer desired represents no "transaction" at all. In addition, the prohibition provided by § 1666(d) against restriction or closing of accounts addresses itself exclusively to creditors operating "an open end *consumer credit plan.*" (Emphasis ours.) Thus, it is the account (or the plan) and not individual transactions which must be characterized as consumer in nature in order to determine the section's applicability to card issuers.

The TILA's definition of the word "consumer" appears in 15 U.S.C. § 1602(h), which reads:

The adjective "consumer," used with reference to a credit transaction, characterizes the transaction as one in which [1] the party to whom credit is offered or

---

**19.** Section 1602(f), as amended in 1974 by Title III of P.L. 93–495, reads in part: "For the purposes of the requirements imposed by Chapter 4 and [other sections of the Act], the term 'creditor' shall also include card issuers . . . and the Board shall, by regulation, apply these requirements to such card issuers, to the extent appropriate, even though the requirements are by their terms applicable only to creditors offering open end credit plans.

**20.** Section 1666 is implemented by 12 C.F.R. § 266.14.

**21.** The Act's definition of "credit" includes not only the right to defer payment on a debt, but also the right to incur debts and defer payment of them. 15 U.S.C. § 1602(e). Regulation Z's counterpart to this definition appears in 12 C.F.R. § 226.2(q) and was renumbered in 1970. *See* notation under "Amendments" following text of § 1602 of Title 15 in U.S.C.S.

extended is a natural person, and [2] the money, property, or services which are the subject of the transaction are primarily for personal, family, household, or agricultural purposes.

The substance of this definition is reproduced in Regulation Z in its definition of "consumer credit."[22] These definitions, further adapted for present purposes, would be transformed into the following definition: a "consumer credit account or plan" is one offered to a natural person for non-business (but including agricultural) purposes. Because of the obvious potential for overlapping uses of a single card, it is appropriate that the definition incorporate a kind of "prospective predominant use" test, one applied at the opening of an account and based on the reasonably anticipated predominant use thereof.

Although we have no statistics to offer on the subject, we believe it may be reasonably said that, in the majority of credit card accounts opened in the name of individuals who assume sole liability for debts to be incurred, predominant usage for non-business purposes is contemplated. Short of a prospective expression by the parties involved negativing such an intent, these accounts should be characterized as consumer credit accounts. Business transactions conducted thereunder should not be allowed to nullify the protection afforded by § 1666. Nor is it anticipated that card issuers will be less than uniform in their handling of billing complaints due to the obvious difficulties of perceiving the nature of individual transactions as complaints are lodged and the consequences that could attend a wrong guess. Just as plainly, in the majority of accounts opened in the names of companies and relying in large part on company credit,

such as the account involved in this litigation, it would be reasonable to anticipate predominant use for business or commercial purposes. If an occasional personal use of a corporate card had the effect of imposing upon card issuers the obligations and penalties of § 1666 which otherwise are inapplicable to company accounts, the section's requirement that a "consumer credit plan" be involved could be rendered meaningless. Such accounts should not be considered "consumer" in nature.[23]

The TILA's general "business use exemption" contained in § 1603(1) can be read to provide the same general exclusion of corporate credit card accounts. The section operates to exempt from the TILA "credit transactions involving extensions of credit for business or commercial purposes." As previously noted, all transactions made through use of a card issued under a company plan involve "extensions of credit"— which, for the purposes of § 1666, means the right to incur debts and defer payment—for business or commercial purposes. Thus, all such transactions are exempted from § 1666 by § 1603(1). Conversely, transactions completed by use of a non-company card generally do involve "extensions of credit" for personal use and, by the negative implication of § 1603(1), are subject to the Act's requirements.

A letter from the Acting Chief of the Fair Credit Practices Section of the Federal Reserve Board reflects that agency's understanding that, unlike the 1970 amendments to the Act, the provisions of Chapter 4, added to the Act in 1974, have limited application to cardholders because of § 1603(1). There, the Board opined that, although Regulation Z defined "creditors" to include card issuers and defined "cardholders" to

---

**22.** 12 C.F.R. § 226.2(p), renumbered in 1970. *See* notation under "Amendments" following text of § 1602 of Title 15 in U.S.C.S.

**23.** On the company application for a supplementary card for plaintiff, he signed a standard, printed statement joining in the application and assuming joint and *in solido* liability for charges to be incurred. The character of

this commitment was not discussed by the parties in these proceedings. If plaintiff's undertaking was intended to be in the nature of a guaranty or suretyship, the primary obligor being the company, as appears the case here, the requirement that credit be extended to a "natural person" also would bar classification of the account as a "consumer credit" one.

include corporate cardholders, the Fair Credit Billing Act (*see* n. 2) does not apply to card issuers in relation to corporate cardholders using the cards solely for business purposes. "This is so," the letter states, "in view of the exemption for credit extended to organizations for business or commercial purposes in § 226.3(a) [Regulation Z's counterpart to § 1603(1)]."[24] This administrative expression concerning the proper construction of the TILA, although not controlling, is to be afforded great weight.[25]

█ Additionally, although the extent of the coverage of the Fair Credit Billing Act vis-a-vis corporate cardholders was not a topic of Congressional discussion during consideration of the amending bills, there is evidence that the legislators understood and intended that such cardholders would not be included. First, throughout the history of the 1974 amendments to the Act,[26] statements of the need for the legislation to correct purportedly high-handed tactics of card issuers in their handling of billing complaints remained constant and unchallenged. While consumers were recognized as beneficiaries of the phenomenal growth of the credit card industry and the use of computerized billing systems, they were also depicted as victims of the new mechanism, frustrated in their attempts to have billing errors corrected through communications with a "robot," harassed by dunning letters, and prone to acquiesce in payment when confronted with the creditors' powerful weapons of threats of ruination of credit ratings and institution of legal action against them.[27] The credit card explosion was demonstrated by statistics which indicated that one-half of all American families used at least one credit card[28] and that, for the average family, charge accounts and monthly bill paying have become a way of life.[29] Perhaps because of the greatly diminished effectiveness of the creditors' weapons when levelled at businesses, the focus was placed on, and the legislation apparently was intended to protect, the family man in his personal dealings. The terms "consumer" and "consumer credit transactions" were used throughout[30] and, as terms of art in the context of the Truth in Lending Act, should be received in their restricted meaning to exclude corporate cardholders and transactions conducted under a commercial account.

Second, when the amendments were reintroduced in the Senate in February of 1973, they incorporated a section which was to become § 1645 of the Act. The text of the proposed new provision (to which amendments not relevant here were later made) read:

> The provisions of section 104(1) [15 U.S.C. § 1603(1)] shall not apply to sections 132, 133, and 134 [15 U.S.C. §§ 1642, 1643, and 1644]. 119 Cong.Rec. S. 2820 (daily ed. Feb. 20, 1973) § 210.

The proposed statute was among those drafted by the Federal Reserve Board and recommended to Congress in the Annual Report of the Board for the year ending December 31, 1972, which was ordered printed in the Congressional Record for that date. In pertinent part, it states:

> . . . To clarify the matter [of whether the TILA's business exemption

**24.** Federal Reserve Board Letter No. 1004 of February 10, 1976, *quoted in,* 5 CCH Consumer Credit Guide, ¶ 31,338.

**25.** *See American Airlines, Inc. v. Remis Industries, Inc., supra,* at 202, and cases cited therein.

**26.** *See* Appendix A attached—"1974 Amendments to the Truth in Lending Act," 8 Clearinghouse Rev. 851, at 851, n. 2.

**27.** *See* S.Rep. No. 92–750, 92d Cong., 2d Sess. (1972), at 2–4, 118 Cong.Rec. S. 6886 (daily ed.

Apr. 27, 1972), 119 Cong.Rec. S. 2803–2805 (daily ed. Feb. 20, 1973), S.Rep. No. 93–278, 93d Cong., 1st Sess. (1973), at 5–6, 119 Cong. Rec. S. 14404 (daily ed. July 23, 1973).

**28.** *See, e. g.,* S.Rep. No. 93–278, *supra,* at S. 2803.

**29.** *See* 119 Cong.Rec. S. 2804 (daily ed. Feb. 20, 1973).

**30.** *See* n. 27.

applied to the prohibition against the unsolicited issuance of credit cards and to the $50 limit on liability for their unauthorized use], the Board amended section 226.13 of Regulation Z to provide that each credit card, regardless of whether issued or used for personal, family, household, agricultural, business or commercial purposes, and regardless of whether issued to a natural person, corporation, or other business entity is covered by [§§ 1642, 1643, and 1644]. These amendments do not affect the business exemption in its application to the disclosure, recission and advertising requirements. (Emphasis ours.)

119 Cong.Rec. S. 2811–12 (daily ed. Feb. 20, 1973). The portion of the annual report underscored in the passage quoted above indicates that the legislators were well aware that the listing of sections to which the business exemption would not apply under authority of the proposed § 1645 was exclusive and that the exemption would continue to operate in § 1637, which prescribes the disclosure obligations of creditors. Section 1637, under the legislation being considered, was to be amended to require that disclosures be made to obligors stating the creditors' responsibilities with regard to handling of billing errors as they

would be established by Chapter 4.[31] It would indeed by anomalous to conclude that Congress intended § 1666 to afford protection to corporate cardholders when it failed to require that disclosures regarding the rights created by § 1666 be made to that segment of the cardholding population.

■ Thus, we find that § 1666 is inapplicable to defendant in its status as a card issuer extending credit under a non-consumer, company account. No investigation need be made into the subjective motivation behind each instance of card use which may be linked causally to the revocation of plaintiff's card. We hold that plaintiff has failed to state a cause of action under the federal Truth in Lending Act.[32] Additionally, we again note plaintiff's concession that his state claims do not involve the amount required for diversity jurisdiction.[33] Plaintiff's objections to the Magistrate's Report and Recommendations are overruled and, accordingly, defendant's Motion for Summary Judgment of dismissal of plaintiff's alleged federal and state claims is GRANTED.

Judgment shall be entered in favor of defendant, dismissing plaintiff's complaint at his costs.

Appendix A to follow.

31. See 119 Cong.Rec. S. 2818, § 104 (daily ed. Feb. 20, 1973). The added provision appears at 15 U.S.C. § 1637(a)(8).

32. There is no merit to plaintiff's contention that American Express should be estopped from raising the defense of exclusion because it

had sent to plaintiff a statement of obligors' rights under the statute. The parties cannot create a federal right and thereby confer jurisdiction on the courts. Wright & Miller, Federal Practice and Procedure: Civil § 3522 at 46–47.

33. See n. 1.

## APPENDIX A

# 1974 AMENDMENTS TO THE
# TRUTH IN LENDING ACT

### By National Consumer Law Center, Inc.*

### I. INTRODUCTION

The Truth in Lending Act (TILA) was significantly amended on October 28, 1974. Because many of the amendments apply to pending TILA lawsuits, the amendments should be studied closely by anyone contemplating or pursuing TILA litigation.[1] This article summarizes the amendments to the TILA disclosure provisions and their legislative history, and examines the issues which may affect low income consumers.

The Act contains many provisions other than TILA disclosure amendments which are not the subject of this article but which should be noted by consumers and their lawyers. These provisions establish rights for consumers faced with billing errors, restrict sex discrimination in the extension of credit, amend banking regulations, and create a National Commission on Electronic Funds Transfers. The provisions on billing errors and sex discrimination will not become effective until October 28, 1975, allowing time for the Federal Reserve Board (FRB) to promulgate regulations. ·

The 1974 TILA amendments were passed by means of a legislative shortcut which considerably diminished their consideration by the House of Representatives.[2] The

Senate had considered and passed several bills to amend the TILA since 1971, generating committee hearings and reports. However, those bills died without House action. The last Senate bill concerning TILA amendments (S.2101) was appended to a House bill on depository institutions (H.R.11221) and passed the House virtually without debate. The act was signed by President Ford on October 28, 1974, and most of the TILA amendments became effective on that date.[3] Three amendments—disclosure of real estate closing costs, codification of the Regulation Z "more than four instalment" rule, and identification of open end transactions within periodic statements—will become effective one year later, October 28, 1975.

### II. CODIFICATION OF EXISTING CASE LAW

Most of the TILA amendments comprise substantive changes in the law. These will be discussed below. However, two amendments merely codified existing case law and require only brief mention. First, amended TILA Subsections 125(a) and (b)[4] affirm that the term "security interest" as used in the TILA includes liens arising by operation of

---

* One Court Street, Boston, Mass. 02108, (617) 523-8010.

1. The text of P.L. No. 93-495 may be found at: 88 Stat. 1500; 43 U.S.L.W. 127, 130-135 (December 10, 1974); 12 *U.S. Code Cong. & Admin. News* 1974: 5684, 5697-5714 (December 15, 1974); and 1 *CCH Consumer Credit Guide* ¶¶3005-3065 (December 10, 1974) (Titles III and IV only).

2. The history of the 1974 TILA amendments began with a bill introduced in the Senate during the first session of the 92d Congress on February 8, 1971, by Senators Proxmire and Brooke. The Senate Subcommittee on Financial Institutions held hearings on October 26-29, 1971, and executive sessions on March 7-8, 1972. The full Senate Committee on Banking, Housing and Urban Affairs met in executive session March 15, 1972 and favorably reported out S.652 with some amendments. S. REP. NO. 92-750, 92d Cong., 2d Sess. (1972). The Senate passed S.652 on April 27, 1972, after extensive debate. *See* 118 CONG. REC. S.6882-6928 '(April 27, 1972). However, the bill died because the House took no action on the bill during the 92d Congress after its referral to the House Committee on Banking and Currency on May 1, 1972.

TILA amendments were reintroduced, on February 20, 1973, as S.914 in the first session of the 93d Congress. *See* 119 CONG. REC. S.2803-2820 (Feb. 20, 1973). Several alternative and related bills were also introduced. Senators Sparkman (D. Ala.) and Brock (R. Tenn.) introduced alternative bill S.1630 on April 18, 1973.

The new Senate Subcommittee on Consumer Credit held hearings on S.914 and S.1630 on May 21-24, 1973, and met again June 19-20, recommending a revised bill to the full Senate Com-

mittee on Banking, Housing and Urban Affairs which included provisions of both S.914 and S.1630. The full Committee met June 27, 1973 and, after amending the revised bill recommended by the Subcommittee, added a new Title III on equal credit opportunity that incorporated the substance of S.867 and S.1605. The Committee then reported out a clean bill numbered S.2101. S. REP. NO. 93-278, 93d Cong., 1st Sess. (1973).

During debates on the revised and renumbered bill S.2101 held on July 23, 1973, the Senate rejected amendments offered by Senators Proxmire and Moss (D. Utah) and approved minor amendments offered by Senator Brock. *See* 119 CONG. REC. S.14403-14431 (July 23, 1973). The bill then passed the Senate and was referred to the House where it languished in the House Banking Committee for the next year.

On June 13, 1974 the Senate unanimously passed H.R.11221 concerning depository institutions, to which the provisions of S.2101 had been appended. *See* 120 CONG. REC. S.10551 -10582 (June 13, 1974). On October 4, 1974 Rep. Patman (D. Tex.) filed the House conference report on H.R.11221. *See* 120 CONG. REC. H.9935-9994 (October 4, 1974). The House passed Bill 355-1 on October 9, 1974, over the heated objections of Reps. Sullivan (D. Mo.) and Eckhardt (D. Tex.) that newly added sections, including the TILA amendments, had never been the subject of full House debates. *See* 120 CONG. REC. H.10269-10281 (Oct. 9, 1974). The Senate approved the conference report on October 10, 1974. *See* 120 CONG. REC. S.18754 (Oct. 10, 1974). The bill was signed into law by President Ford on October 28, 1974.

3. *See* text accompanying nn. 46-52 for additional discussion of effective date.

4. 15 U.S.C. §§1635(a) and (b).