478 P.2d 546

**SOUTHWESTERN PORTLAND CEMENT,**
a corporation, Plaintiff-Appellee,

v.

**A. E. BEAVERS, B. C. Glasgow and P. G.
Adams, d/b/a Plains Sand and Grav-
el, Defendants-Appellants.**

No. 9071.

Supreme Court of New Mexico.

Dec. 28, 1970.

Walker, Hart & Laflin, Oliver H. Miles, Clovis, for defendants-appellants.

Richard M. Snell, Clovis, for plaintiff-appellee.

## OPINION

McKENNA, Justice.

Appellee Southwestern Portland Cement brought this suit to collect payment on an account in the amount of $1,647.00, plus costs and attorney fees, against appellants Beavers and Glasgow, doing business as Plains Sand and Gravel, and defendant Adams. Judgment was entered against all three jointly and severally for the sum sued for, plus costs and attorney fees of $549.31. Only Beavers and Glasgow appealed.

In February of 1968, the appellants formed a partnership known as Plains Sand and Gravel to provide concrete for a construction project at Cannon Air Force Base. The general contractor for the project was Wilkerson-Webb. Defendant Adams had no proprietary interest in the partnership. In March, 1968, the partnership entered into an oral agreement with Adams to use his ready-mix concrete batching plant and delivery trucks to mix and deliver concrete to the project. The partnership made arrangements with appellee Southwestern to furnish bulk cement to Adams at his plant. The method of payment for the delivered concrete was for Wilkerson-Webb to issue their check payable jointly to Plains Sand and Gravel and to Southwestern.

On March 20, 1968, and again on April 30, 1968, Southwestern delivered cement to Adams' plant for the partnership account. Adams received these deliveries at his plant and signed truck tickets for the cement on behalf of Plains Sand and Gravel for the Cannon Air Force job. These two deliveries of cement were paid for by Wilkerson-Webb's joint check in the amount of $1,052.70.

On July 10, 13 and 16, Adams ordered cement from Southwestern telling it that the order was for Plains Sand and Gravel. Similarly, Adams received the three deliveries at his plant, signed truck tickets for receipt of the cement on behalf of Plains Sand and Gravel for the Cannon Air Force job.

It was established during trial that prior to the last three deliveries by Southwestern, Adams' equipment broke down and he was unable to deliver the concrete to the job site and Plains Sand and Gravel made other arrangements with another firm to deliver the concrete. However, the appellants did not inform Southwestern of this prior to the last three deliveries. After the last of the three deliveries, Southwestern contacted Wilkerson-Webb to "confirm" the amount of concrete usage on the job and to "reconfirm" the guarantee of payment. It was then informed that only a negligible amount of concrete was supplied by Plains Sand and Gravel for the job, and Wilkerson-Webb refused to issue a joint check for the delivered cement. Thereupon, Southwestern called one of the appellant partners who denied that Adams had authority to order the cement.

Southwestern then sued Beavers, Glasgow and Adams for the last three loads delivered.

The testimony was conflicting as to whether Adams or one of the appellants placed the first two orders. Adams said he did; Beavers said his partner did. The court found that Adams placed the first two orders as well as the last three. This finding is of no consequence, however, because there is no finding that the first two calls were relied upon by appellee in any way.

The findings of fact pertinent to this appeal are:

"8. In March, 1968, Plains Sand & Gravel entered into a sub-contract to

supply concrete on a construction project at Cannon Air Force Base, New Mexico, and then made an oral contract with Adams whereby Adams was to use his ready-mix concrete batching plant and delivery trucks to mix and deliver concrete on said project, with Plains Sand & Gravel furnishing the cement and aggregate. Plains Sand & Gravel made arrangements with plaintiff to furnish bulk cement to Adams for use on said project, and deliveries were made by plaintiff to Adams under this arrangement in March and April, 1968, and paid for by the prime contractor on the project in behalf of Plains Sand & Gravel."

This finding was uncontested; the court, however, proceeded further and found:

"9. Plains Sand & Gravel authorized Adams to order cement from plaintiff for use on said project, and Adams ordered the cement which was delivered to him by plaintiff in March and April, 1968. Adams' authority to so order cement was not cancelled until after July, 1968. This course of dealing gave Adams apparent authority to place other orders for cement from plaintiff on behalf of Plains Sand & Gravel.

"* * *

"11. On July 10 and 13, 1968, Adams ordered additional loads of bulk cement from plaintiff on the Plains Sand & Gravel account, without specific authority from Plains Sand & Gravel. * * *"

The court concluded:

"2. Plains Sand & Gravel as principal is estopped to deny the authority of Adams as its agent to order the cement involved in this action, having clothed Adams with apparent authority to order same, and plaintiff having acted on said apparent authority in good faith and to its detriment."

For reversal, the appellants argue that there was no substantial evidence to support the finding that Adams had apparent authority from the course of dealing to order the last three loads of cement and

Southwestern was negligent by not inquiring into the scope of Adams' authority and this negligence precluded appellee from any recovery. Although the trial court may have given some weight to finding 9, even though there is no finding of any reliance by appellant on any orders from Adams, we do not find this fatal to its judgment if uncontested finding 8 is alone sufficient to uphold the judgment. Board of Education, School District 16, etc. v. Standhardt, 80 N.M. 543, 458 P.2d 795 (1969).

■ Obviously, the course of dealing was not lengthy, and was limited, in terms of time span and deliveries, but this must be viewed in light of the limited business relationship which was involved—it was for only one project at Cannon Air Force Base. It is equally obvious that the component acts in the course of dealing were identical and reflected a common pattern. See Ulen v. Knecttle, 50 Wyo. 94, 58 P.2d 446, 111 A.L.R. 565 (1936). Each of the deliveries made to Adams by Wilkerson-Webb was for the account of Plains Sand and Gravel for use on the particular project in accordance with the pre-arranged procedure. Each delivery was made to the same location; each was receipted for by Adams for the partnership. If Southwestern had not been paid for the first two loads, it would have been warned or alerted—at least the law would so view it (Malia v. Giles, 100 Utah 562, 114 P.2d 208 [1941])—but having been paid for the first two loads by the very procedure agreed upon, Southwestern could reasonably construe this as ratification of the previous course of business. We cannot say that under these circumstances Southwestern acted in bad faith or without reasonable prudence in delivering the last three shipments. As between Southwestern and the partners, it is the latter's conduct which fails to meet the test of reasonable prudence, for not only did they have the responsibility for the relationship, they neglected to notify Southwestern that they had made different arrangements for delivery of the concrete when Adams' equipment broke down. If they had done this,

Southwestern's delivery of the last three shipments would have been at its peril.

An agent's scope of authority embraces not only his actual authority but also that apparently delegated. A settled course of conduct does serve to create apparent authority in the agent binding upon the principal where the acts are not timely disavowed and a third party is thereby induced to rely on the ostensible authority of the agent and does so in good faith and with reasonable prudence. The doctrine is based upon an estoppel: the principal will not be permitted to establish that the agent's authority was less than what was apparent from the course of dealing for when one of two innocent parties must suffer, the loss must fall upon the party who created the enabling circumstances. Raulie v. Jackson-Horne Grocery, 48 N.M. 556, 561, 154 P.2d 231 (1944); South Second Livestock Auction, Inc. v. Roberts, 69 N.M. 155, 364 P.2d 859 (1961); 3 Am.Jur. 2d, Agency, 475, 478, 479, §§ 73, 75, 76; 2 C.J.S. Agency § 96d(3), p. 1213.

In Record v. Wagner, 100 N.H. 419, 128 A.2d 921 (1957), the defendant hired one Berry to operate his farms. Berry requested the plaintiff to bale hay. At Berry's direction, the plaintiff made out his bill to the defendant; Berry gave it to the defendant who paid it. The next year the plaintfif was again asked to bale hay the same as last year. The plaintiff gave his bill to Berry who then gave it to the defendant for payment, but the defendant refused to pay it, alleging that Berry's authority had been terminated prior to the work having been done. The court found that the defendant gave no notice to the plaintiff, and that the plaintiff saw no change in the operation of the farm, and ruled that the defendant so conducted the farm as to give the plaintiff the right to believe that Berry was authorized to hire him to bale the hay. The court's reasoning, 128 A.2d at 923, was:

"* * * By paying the 1953 bill, the defendant recognized Berry's authority to hire the plaintiff on the former's credit. Berry then resided on the defendant's farm, and was properly found the defendant's agent at that time, whether he was in fact hired by the defendant individually, or by some other member of the 'cooperative' which could be found to have been a partnership. In 1954, Berry continued to reside on the main farm, and to all appearances was operating it in the same manner and in the same capacity. If in fact he had ceased to occupy the farm as agent, but did so as a tenant, the defendant made no effort to notify the plaintiff of the change in Berry's status.

"It could be found that in the exercise of reasonable diligence the plaintiff was justified as a result of the defendant's conduct in believing that Berry had authority to pledge the defendant's credit in 1954 for the same services which the defendant recognized as a proper charge against himself in 1953. * * * The important fact is that the defendant permitted the outward appearances of Berry's authority to remain unchanged in 1954 from what they were in 1953, and by not notifying the plaintiff of the termination of the agency permitted the plaintiff to be misled. Having done so, he rather than the plaintiff should bear the loss. * * *"

See Roberson v. Bondurant, 41 N.M. 638, 73 P.2d 321 (1937).

The appellants cite Baldwin Piano Co. v. Wade & Co., 30 N.M. 285, 232 P. 523 (1924), as a similar situation supportive of their position, but close analysis will reveal that it is not similar. The piano company furnished pianos to Wright on consignment. Wright ran a music store. He rented a building from Wade to store the pianos. When Wright did not pay the rent, Wade sued the piano company for the rent claiming that Wright had authority as an agent to rent the building. At 287, 232 P. at 524, we decided that Wright had no

actual or implied authority to rent the building stating:

"Nor is it shown to be customary for persons receiving pianos on consignment to rent store buildings for the owner of the same. Nor is any such course of business between these parties shown to have been previously carried on and ratified by appellant. Nor can the power result from estoppel of appellant, for it is not shown to have done any act upon which appellees, as reasonably prudent men, might rely and take a position to their detriment. * * * "

◼ The appellants argue that Southwestern did not act with reasonable diligence and was negligent in failing to inquire into Adams' authority as evidenced by Southwestern's statement that after the delivery of the last three shipments, it did contact Wilkerson-Webb to check into the cement usage at the Air Force Base and to reconfirm the guarantee of payment. No particular conclusion of law was submitted by the appellants to the court that this after-the-fact inquiry constituted negligence or failure to exercise reasonable prudence or diligence on the part of Southwestern but we will consider the argument included as a matter of law in the appellants requested conclusion of law that Adams had no apparent authority to order the July shipments of cement.

The inquiry made by Southwestern was primarily directed to whether Wilkerson-Webb would pay for the cement by joint check as it did in the past, rather than the apparent authority of Adams to order the cement on behalf of the appellants. While payment by joint check of Wilkerson-Webb was the arranged procedure for payment, however, at the time of the last shipment there had been no departure from the course of dealing that would serve to alert Southwestern. As observed earlier, payment for the first two shipments served to confirm the course of dealing. There was no evidence presented by the appellants that the total amount of the last three shipments was so inordinate as to cause suspicion, nor was evidence of any other alerting factor introduced, and arrangements made by the partnership did not require Southwestern to first check with Wilkerson-Webb before delivering cement.

◼ Standing by itself, under the circumstances presented, we do not believe that the inquiry made *after* the cement was delivered constitutes as a matter of law negligence or failure to exercise reasonable diligence. It is the appellants who should bear the loss since they are responsible for a course of business with the necessary apparent authority and are now estopped to deny that authority, the appellant having reasonably relied upon it. Furthermore, balancing the positions of both sides, the appellants fall short for they could have easily averted their loss by advising Southwestern that they had made other arrangements for the concrete because of Adams' equipment failure. Record v. Wagner, supra.

The appellants claim that Southwestern *did not know* who placed the first orders for cement and accordingly it could not rely on a settled "course of conduct" as to the last three shipments. Southwestern's evidence did not cover this point specifically, but we believe it immaterial. The district court's uncontested finding No. 8, supra, is that the partnership made arrangements with Southwestern to furnish cement to Adams on behalf of the partnership for use on the project and deliveries were made to Adams in accordance with the agreed procedure for which payment was made and received. We think this sufficient to establish a course of dealing for which appellants should be held responsible. The primary test for determining the scope of apparent authority is not the acts of the agent but the principal's conduct. Malia v. Giles, supra, 114 P.2d at 211; 2 C.J.S. Agency § 96e(2), 1214. Finding 8 alone is sufficient to sustain the judgment.

The appellee asks for reasonable attorney fees here for defending this appeal, but our statute (§ 18–1–37, N.M.S.A., 1953)

does not clearly establish that right and the request is denied.

The judgment is affirmed and it is so ordered.

WATSON and SISK, JJ., concur.