Gary M. HAGEL and Susan I. Hagel,
Plaintiffs and Appellants,

v.

BUCKINGHAM WOOD PRODUCTS, INC., d.b.a. Midwestern Homes, and Ed Koch, Individually, and as Agent for Buckingham Wood Products, Inc., Defendants and Appellees.

Civ. No. 9370.

Supreme Court of North Dakota.

Dec. 19, 1977.

Rehearing Denied Jan. 11, 1978.

**870**

Orville A. Schulz, New Salem, for plaintiffs and appellants.

Zuger & Bucklin, Bismarck, for defendants and appellees; argued by Robert V. Bolinske, Bismarck.

SAND, Justice.

Plaintiffs Gary M. and Susan I. Hagel (hereinafter Hagels) appealed from that portion of the Burleigh County District Court's judgment dismissing the complaint against co-defendant Buckingham Wood Products, Inc., d.b.a. Midwestern Homes (hereinafter Midwestern Homes). Hagels brought an action against Midwestern Homes and Ed Koch, individually and as agent for Midwestern Homes, which resulted in a judgment only against Koch and in favor of Hagels, in the amount of $16,-208.17, for failing to complete the construction of a home.

The Hagels initiated their first contact with Midwestern Homes by responding to an ad placed in the Bismarck Tribune. The Hagels mailed the ad to Midwestern Homes' main office in Rapid City, South Dakota, in October 1974, and received a catalog in which a letter from Midwestern Homes designating Randall Pooley as the area representative was enclosed.

In November 1974, Koch telephoned the Hagels, and according to their testimony, advised them that he was a representative of Midwestern Homes. (Koch disputed that he was a representative.) A meeting between the Hagels and Koch was subsequently arranged. At that meeting, Koch gave the Hagels a newer edition of Midwestern Homes' catalog, which contained the handwritten notation, "Ed Koch Cost. Co., Bismarck, 223–8260," on the cover's upper left-hand corner. Koch also gave the Hagels a pen with "Midwestern Homes" advertised on it.

At this first meeting in November 1974, Koch assisted the Hagels in reviewing the housing designs contained in the Midwestern Homes' catalog. According to Koch's testimony, he informed the Hagels that he was a local builder-contractor involved in constructing prefabricated homes.

After several meetings with Koch, the Hagels selected the "Jamestown" home design with modifications, including the addition of a double garage and a recreation room. According to undisputed testimony, the Hagels could purchase the home as (1) package—material only; (2) partially completed; or (3) fully completed. The Hagels chose a fully completed "Jamestown" home, with only the exterior painting and landscaping left unfinished.

In a January 1975 letter, Midwestern Homes quoted Koch the figure of $19,298.54 as the retail price of the "Jamestown" home package. On 3 February 1975, the Hagels and Koch signed a single instrument entitled "Proposal" for both the purchase and construction of the home, for a total price of $36,543.18, including $20,700.03 specified for the "Jamestown" home package. The agreement was subject to financing, which the Hagels secured from the Veterans Administration with the help of Koch and the technical assistance of Midwestern Homes' personnel. Koch then ordered the home from Midwestern Homes.

On 24 March 1975, Midwestern Homes sold the "Jamestown" home package to

Koch for $17,665.12, or almost a ten percent discount on the retail price of $19,298.54 quoted earlier for Koch and the Hagels. Construction on the Hagels' home began 22 April 1975. During the period of construction, signs were placed in front of the site and in the picture window of the house advertising it as a Midwestern Home.

Before the prefabricated walls were delivered, Randall Pooley, area representative for Midwestern Homes, visited the construction site to measure the basement of the home. At the time the prefabricated walls were delivered to the home site, a Midwestern Homes' truck or crane assisted in raising the walls.

Construction on the Hagel home proceeded smoothly until August 1975, when Koch, apparently out of funds, abandoned the construction, leaving the home incomplete.

The Hagels' action against Buckingham Wood Products, Inc., d.b.a. Midwestern Homes, and Ed Koch, individually, and as an agent of Midwestern Homes, sought damages in the amount of $30,000.00 for a breach of contract allegedly committed by Midwestern Homes and its agent, Koch.

The trial court gave the Hagels a judgment but only against Koch individually, in the amount of $16,208.70, but dismissed the complaint against Midwestern Homes. The Hagels appealed from the judgment dismissing the complaint against Midwestern Homes.

The Hagels contend the trial court erred by not finding that a continuing relationship of principal and agent existed between Midwestern Homes and Koch for the construction of the home, making Midwestern Homes liable for the breach of contract committed by Koch, its agent.

The pertinent findings of fact by the trial court are:

"VIII.

"There exists no written or oral contract between Midwestern Homes and its builder-dealers except those individual contracts entered into for the sale by Midwestern and the purchase by the builder-dealer of each individual house package.

"IX.

"In the instant case, plaintiffs saw an ad in a local newspaper advertising Midwestern homes. They clipped the coupon from the ad, filled it out and sent it to Midwestern to get a catalog of Midwestern homes. In response, plaintiffs received a catalog from Midwestern.

"X.

"Sometime thereafter, when plaintiffs were at a Bismarck hospital, awaiting the birth of their second child, in November of 1974, plaintiffs received a telephone call from defendant Koch. A meeting was arranged shortly thereafter at plaintiffs' home in Center, North Dakota. At that meeting, Koch delivered a newer edition of the Midwestern catalog to plaintiffs.

"XI.

"After several additional meetings and telephone conversations, plaintiffs decided to purchase the "Jamestown" type home with several changes and additions.

"XII.

Defendant Koch was neither the actual nor ostensible agent of Buckingham Wood Products, Inc., d/b/a/ Midwestern Homes for the construction of the subject home.

"XIII.

"Plaintiffs knew or should have known that they were entering into an agreement with Koch, not Midwestern Homes, for the construction of their home.

[Intervening numbers were skipped.]

"XIX.

"Midwestern Homes has fully performed its agreement by providing the house package contracted for and by remedying the minor defects in the materials claimed by plaintiffs.

"XXII.

"The Court's Memorandum Opinion dated April 4, 1977, and the findings of fact and other matters contained therein are hereby incorporated herein by reference and made a part hereof."

The trial court's memorandum opinion states, in part, as follows:

"The next contact the plaintiffs had was through Ed Koch. It is obvious from the circumstances and the testimony that when Midwestern Homes received the inquiry from the plaintiffs, that organization in turn contacted Mr. Koch to pursue the matter further. There is some conflict in the testimony as to how Mr. Koch characterized himself when he introduced himself to the plaintiffs, but it is clear that he was, at that point, acting as agent for Midwestern Homes. A company can only act through its agents and, in fact, the evidence shows that the entire course of dealing with Midwestern Homes and the plaintiffs was conducted through Mr. Koch.

. . . . . .

". . . But any such relationship as does exist between these two parties relates to the furnishing of the home as a package and not to the construction of that home.

". . . There is no doubt that Mr. Koch functioned as an agent on behalf of Midwestern Homes for certain purposes. But those purposes related to the selling of the home. The contract to construct the home is a separate matter in which the plaintiffs could have selected Ed Koch, hired someone else, or done the work themselves.

"Thus, while there are many indicia of an agency relationship referred to by the plaintiffs, those indicia are not such as would lead a person of reasonable intelligence to believe that Midwestern Homes had undertaken any obligation to actually construct the packaged home. . . . The Court concludes that it has not been established that Mr. Koch was an agent of Midwestern Homes, actual or ostensible, for the construction of the house."

The trial court, in its conclusions of law, stated:

"II.

"Defendant Koch was neither the actual nor apparent nor ostensible agent of Buckingham Wood Products, Inc. d/b/a/ Midwestern Homes for the construction of plaintiffs' home.

"III.

"Plaintiffs have failed to establish an agency relationship between Buckingham Wood Products, Inc. d/b/a/ Midwestern Homes and Koch for the construction of the home by clear and convincing evidence as is required and have, therefore, failed to sustain their burden of proof."

A brief review of some of the pertinent evidence and the atmosphere it produced under which the transaction took place will be helpful in developing a better understanding and resolution of the ultimate issue.

The first contact the Hagels had with Midwestern Homes, outside of the newspaper ads, was the catalog they received from Midwestern Homes (in response to their mailing in a clipping of the newspaper ad) containing the following letter which was attached to the inside of the first page of the catalog:

```
            "MIDWESTERN HOMES

        N OF BUCKINGHAM WOOD PRODUCTS, INC.
Corner    AREA CODE 605 TELEPHONE 342 6560
torn          P.O. BOX 2064
out           RAPID CITY, SOUTH DAKOTA  57701

                DATE    YOUR AREA REPRESENTATIVE

   . Hagel   11-11-74   Randall Pooley
   :1                   Box 640
 .er; ND 58530          Rapid City, SD 57701

WE'RE PROUD AS A PEACOCK ---

To send you this beautiful new catalog of
MIDWESTERN HOMES.

We sincerely hope you will be able to find
the exact home you want within these pages.
If not, perhaps it will give you some ideas
we can incorporate in a MIDWESTERN HOME
designed 'just for you.'  Our design and
drafting department is 'at your service.'

The MIDWESTERN HOMES representative serving
your area (he most likely delivered your
catalog in person) is an expert in his field
and will be most happy to assist you with
your home planning problems.

MIDWESTERN HOMES proudly states we are
'THE MOST COMPLETE PRE-ENGINEERED HOME ON
THE MARKET TODAY' and offer you quality
surpassed by no other home manufacturer.

'Door-to-door, roof-to-floor, you get More
in a MIDWESTERN HOME.'

Yours truly,

MIDWESTERN HOMES, DIVISION OF
BUCKINGHAM WOOD PRODUCTS, INC.
P. O. Box 2064, Rapid City, South Dakota"
```

This letter created the atmosphere under which the Hagels and Koch discussed the selection, purchase, and construction of the "Jamestown" home. It also justified Hagels' belief that Koch was an agent of Midwestern Homes, as can be readily determined from Randall Pooley's answers to questions submitted by the trial court.

"Q [THE COURT] I do not understand what the interest of your company is if there is no connection between you and the ultimate purchaser of this home. What is the interest of the company in informing the public that you are the area representative?

"A [Pooley] The letter stems—you see, there has been a change in recent years. I think that letter was originally made up back in the 50's. At that time there was a period of time that we were selling to the public, that we did act as contractor, and that was back in the 50's, I believe, long before my time, and the letter dates back to that period of time and had not been updated for some time.

"I do, if I may continue, do have contact with the public in the sense that if I have a request for a home in an area where I do not have a builder-dealer, I do tell them I am not a builder or contractor and am not involved in building homes, but I cannot sell directly to them.

"Q Now, Mr. Koch mentioned what he described as a change in policy upon the part of Midwestern, in which they required the money before sending the home; is that correct? Was there a change of policy?

"A In that given instance, there was.

"Q What do you mean by that? You mean, it applied to him?

"A Yes, I have explained—part of my testimony was at that time the letter of termination—the letter explained he had a balance deriving from a house package previous to that of the Hagels, in which the balance was unpaid, and in that instance, with any dealer we want the payment in advance until that previous matter is settled. So, yes, there was a change of policy at that time.

"Q Can you tell me how that was communicated to Mr. Koch or when?

"A I believe it was done by phone. I am trying to remember if I personally visited with Mr. Koch. I can't recall if it was me or a company official. I know it was relayed to him by the company."

The court then inquired whether Koch was aware of the cash-in-advance requirement at the time he entered into the Hagel contract which was accepted by Midwestern Homes. Mr. Pooley replied:

"I believe he was not aware of that problem until the phone call. That's the best I can do. I am not sure precisely when he found out. This I am not sure of."

This clearly establishes that the letter was designed to carry the message, by implication, that Midwestern Homes not only sold, but constructed the homes. Pooley's testimony clearly establishes that at the time this letter was sent out in the 50's it was the practice of Midwestern Homes to not only sell, but also construct the homes. The Hagels should not be blamed for the error or oversight of Midwestern Homes by not revising the letter after a change in business practices occurred.

■ After reviewing the record, we are satisfied there is substantial evidence supporting the trial court's finding of fact that an agency relationship existed between Midwestern Homes, as principal, and Koch, as agent, for the sale of the "Jamestown" home to the Hagels.

We also note that the trial court had the benefit of reading the newspaper ad which was introduced and received as an exhibit but was lost and later replaced by a substitute, which was also lost, and as a result this Court did not see it. The trial court observed that the exhibit was last in the possession of Koch. We therefore cannot charge the loss against the Hagels.

We now examine the statutory provisions and case law as they may relate to the issues of this case.

Section 3–01–03, North Dakota Century Code, provides as follows:

"An agency is either actual or ostensible. It is actual when the agent really is employed by the principal. It is ostensible when the principal intentionally or by want of ordinary care causes a third person to believe another to be his agent, who really is not employed by him."

In *Scherbenske v. Maier*, 71 N.W.2d 770, 773 (N.D.1955), the Court referred to § 3–01–03, NDCC, and quoted from *Bernard v. Madsen*, 52 N.D. 822, 204 N.W. 196, 200, as follows:

"[This section] . . . . is but a statement of a well established principle of the common law, which, it has been declared, lies at the foundation of the law of agency. Under this statute an ostensible agency exists where the conduct of the supposed agent is consistent with the existence of an agency, and where, in the transaction in issue, the party with whom the supposed agent dealt was justified in assuming that the agency existed. It would seem that the essential features of authority, within the purview of this section, are that the third party must have believed in the existence of the authority in the supposed agent, and such belief must rest upon some act or statement of the principal sought to be bound by the alleged authority. There must have been some conduct on the part of the principal reasonably resulting in the belief, in the mind of the third party, that an agency existed together with a reliance thereon."

Section 3–02–02, NDCC, provides as follows:

"An agent has such authority as the principal actually or ostensibly confers upon him. Actual authority is such as a principal intentionally confers upon the agent or intentionally or by want of ordinary care allows the agent to believe himself to possess. Ostensible authority is such as the principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess."

This Court, in *McLane v. F. H. Peavey & Co.*, 72 N.D. 468, 8 N.W.2d 308, 310 (1943), set down a test for apparent or ostensible agency, which is based upon the principle of estoppel:

"It must rest upon conduct or communications of the principal which reasonably interpreted causes a third person to believe that the agent has authority to act for and on behalf of the principal."

See also, *Duluth Herald and News Tribune v. Plymouth Optical Company*, 286 Minn. 495, 176 N.W.2d 552 (1970).

Section 3–03–03, NDCC, provides as follows:

"A principal is bound by acts of his agent under a merely ostensible authority to those persons only who in good faith and without ordinary negligence have incurred a liability or parted with value upon the faith thereof."

In *Meyer v. National Fire Insurance Co. of Hartford, Conn.*, 67 N.D. 77, 269 N.W. 845, 849 (1936), involving an insurance question, this Court said:

"Where a third party believes in the existence of such authority, and the belief rests upon some act of the principal sought to be bound, and there has been such conduct on the part of the principal reasonably resulting in this belief, the principal is estopped to deny this ostensible authority. *Bernard v. Madsen* et al., 52 N.D. 822, 204 N.W. 196; *First Nat. Bank, etc., v. Henry*, 30 N.D. 324, 152 N.W. 668. In that case the principal is bound, even though he may be ignorant as to its exercise, for the authority is as broad as the principal has permitted it to be, or made it appear to be. *Grant County State Bank v. Northwestern Land Company*, 28 N.D. 479, 498, 499, 150 N.W. 736."

In *Southwestern Portland Cement v. Beavers*, 82 N.M. 218, 478 P.2d 546, 549 (1970), the Court said:

"An agent's scope of authority embraces not only his actual authority but also that apparently delegated. A settled course of conduct does serve to create apparent authority in the agent binding upon the principal where the acts are not timely disavowed and a third party is

thereby induced to rely on the ostensible authority of the agent and does so in good faith and with reasonable prudence. The doctrine is based upon an estoppel: the principal will not be permitted to establish that the agent's authority was less than what was apparent from the course of dealing for when one of two innocent parties must suffer, the loss must fall upon the party who created the enabling circumstances. [Citations omitted.]"

In *Duluth Herald and News Tribune v. Plymouth Optical Company*, 286 Minn. 495, 176 N.W.2d 552, 555 (1970), the Court said:

"Plaintiff relies principally on *Lindstrom v. Minnesota Liquid Fertilizer Co.*, 264 Minn. 485, 119 N.W.2d 855, and Restatement, Agency (2d) § 27. The latter states that—

'* * * apparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.'

"Apparent authority has only limited effect. It exists only as to those third persons who learn of the manifestation from words or conduct for which the principal is responsible.[1]

"The general rule is that a principal is bound not only by the agent's actual authority but also by that which the principal has apparently delegated to him. 3 Am.Jur. (2d) Agency, § 73.

[1] Restatement, Agency (2d) § 8, comment *a*."

In *McGee v. Breezy Point Estates*, 283 Minn. 10, 22, 166 N.W.2d 81, 89 (1969), the Minnesota Supreme Court said:

"An agent's apparent authority results from statements, conduct, lack of ordinary care, or other manifestations of the principal's consent, whereby third persons are justified in believing that the agent is acting within his authority. Therefore, the scope of apparent authority is determined not only by what the principal knows and acquiesces in, but also by what the principal should, in the exercise of ordinary care and prudence, know his agent is doing.

"Thus, if a principal acts or conducts his business either intentionally or through negligence, or fails to disapprove of the agent's acts or course of action so as to lead the public to believe that his agent possesses authority to act or contract in the name of the principal, the principal is bound by the acts of the agent within the scope of his apparent authority as to persons who have reasonable grounds to believe that the agent has such authority and in good faith deal with him. 3 Am.Jur. (2d) Agency, § 74."

Section 78, page 482, 3 Am.Jur.2d, *Agency*, states:

"A third person dealing with a known agent may not act negligently with regard to the extent of the agent's authority or blindly trust the agent's statements in such respect. Rather, he must use reasonable diligence and prudence to ascertain whether the agent is acting and dealing with him within the scope of his powers. The mere opinion of an agent as to the extent of his powers, or his mere assumption of authority without foundation, will not bind the principal; and a third person dealing with a known agent must bear the burden of determining for himself, by the exercise of reasonable diligence and prudence, the existence or nonexistence of the agent's authority to act in the premises. The principal, on the other hand, may act on the presumption that third persons dealing with his agent will not be negligent in failing to ascertain the extent of his authority as well as the existence of his agency."

In *Hodson v. Wells & Dickey Co.*, 31 N.D. 395, 154 N.W. 193, 194 (1915), this Court said:

"It is well settled that a party dealing with the agent of a corporation must, at his peril, ascertain what authority the agent possesses, and is not at liberty to charge the principal by relying upon the agent's assumption of authority, which may prove to be entirely unfounded."

While this is an accurate statement of the law, it does not apply here because the letter addressed to the Hagels and attached to the catalog constituted sufficient grounds for the Hagels to justifiably assume that Koch was an agent for Midwestern Homes and that there was no need to inquire further. In this case we do not have the question as to the extent of the agent's authority, but merely whether he was an agent.

In an Annotation found in 55 A.L.R.2d, *Agent—Authority to Purchase Goods*, page 111, the following statement is made:

"The question whether an agent, in purchasing goods or merchandise, was acting within the scope of his implied or apparent authority, so as to render his principal liable, is ordinarily one of fact for the determination of the jury."

In *Fargo National Bank v. Agricultural Ins. Co.*, 184 F.2d 676, 683 (8th Cir. 1950), the Court, with reference to § 3–03–03, NDCC, said:

"Recovery under this statute could be had under the ostensible authority of an agent only by those who without ordinary negligence have parted with value upon the faith of ostensible authority of the agent."

In *Rodine v. Iowa Home Mutual Casualty Company*, 171 Neb. 263, 106 N.W.2d 391, 398 (1960), the Court said:

"It is generally required before a recovery may be predicated upon apparent authority that the person dealing with the agent must establish that at the time he dealt with the agent he believed that the agent was acting within the scope of his authority and that he had no notice or knowledge of any fact or circumstance which would indicate to a reasonably prudent person in similar circumstances that the agent had no actual authority to bind his principal in the matter."

It also said:

"A principal is not bound if the agent exceeds the scope of his authority and the absence of authority is known to the person dealing with him or if the third person knows or should know the limitation of the authority of the agent."

We have no difficulty in affirming the trial court's finding of fact that Koch was an agent for Midwestern Homes for purposes of selling the "Jamestown" home. However, we cannot agree with the trial court's determination that Koch was not an agent for the construction of the home. Both the sale and construction of the home were included in a single instrument entitled "Proposal," which was executed by Koch and the Hagels. We have difficulty in attempting to treat them as two separate transactions. We must apply the attending circumstances to the entire instrument.

We have given due regard to the form of the "proposal" which had "Ed Koch Construction Co." stamped after the word "From" in the upper left corner. The opening paragraph, however, states, "We hereby propose to furnish all materials and perform all labor," which can be construed to mean Koch Construction and Midwestern Homes as "we."

If we were to rely solely upon the executed "proposal" without regard to the circumstances and atmosphere under which it came into being and was agreed upon, or if the sale and construction were contained in separate instruments with a time interval, we would have no difficulty in agreeing with the trial court that no agency existed for the construction portion. But we must consider the entire transaction from beginning to end.

From and after Midwestern Homes' initial contact with the Hagels through the letter in the catalog which created the appearance of principal and agent between Koch and Midwestern Homes, Midwestern Homes performed no act disclosing a contrary situation, nor did Midwestern Homes communicate with Hagels indicating that Koch was not its agent. The actions of Midwestern Homes were compatible with an agency relationship.

Midwestern Homes created this situation and stood to gain by it by the sale of a home.

Midwestern Homes, by want of ordinary care, caused the Hagels to believe Koch was

its ostensible agent for both the sale and construction of the home. Sections 3–01–03 and 3–02–02, NDCC; *Meyer* and *McLane, supra.*

Under the provisions of § 3–03–03, NDCC, Midwestern Homes is bound by the mere ostensible authority it created and permitted to continue in Koch causing the Hagels to rely upon Koch's authority and to part with value because of such ostensible authority.

Midwestern Homes either knew, or should have known, that the letter in the catalog could or would create an erroneous impression. In fact, the testimony of Pooley clearly establishes that the letter was used in the late 1950's by the company when it not only sold homes to the general public but also contracted to construct them.

■ We believe the principal, after allowing or permitting the creation of an ostensible agency relationship, is obligated to correct the erroneous impression left by means at least equal to, or greater than that which permitted or allowed the impression to be created.

■ Failure to correct an ostensible agency relationship will make the principal liable to third parties which acted thereunder in good faith. *Southwestern Portland Cement v. Beavers,* 82 N.M. 218, 478 P.2d 546 (1970). Midwestern Homes did nothing to cause the Hagels from continuing to believe that Koch was the agent for Midwestern Homes.

We do not believe the agency relationship impression left by the letter was corrected by the statement found in the catalog under the heading "COMPLETE."

"Your Midwestern Homes Builder-Dealer can erect a completely finished Midwestern Home, designed for you, on your site, ready for occupancy. He'll hand you the keys to years of comfort, convenience and savings."

Nor did the following language, as found on page 4 of the catalog, correct the impression.

"Your Midwestern Homes Dealer is unique in the industry . . . he's not just a salesman . . . he's a builder. He's a local businessman who has earned an excellent reputation through years of building experience. He is a Midwestern Homes Dealer because of his qualifications.

"His 'know-how' and expertise can assist you in putting your thoughts and ideas into plans. He is able to completely execute your construction wishes.

"Most important, he'll be around 'after the sale' for counseling, assistance and service."

The letter was addressed to the Hagels, whereas the foregoing statements were found in the catalog generally. We also observe that the letter does not make reference to dealerships mentioned in the catalog.

■ We believe that he who creates an erroneous impression and stands to gain from the transaction should be held liable for the resulting damages, if any, to the innocent third party. *Southwestern Portland Cement v. Beavers, supra.*

In summary, the Hagels believed, and justifiably so, that Koch was an agent for Midwestern Homes. The trial court found that Koch was an agent for Midwestern Homes for the sale of the home. There was sufficient evidence to support this finding. The discussions on the sale and construction of the home culminated in the execution of one instrument entitled "Proposal," covering both the sale and construction. The use of the word "we" in the proposal could have been understood by the Hagels to mean Koch and Midwestern Homes. The letter attached to the catalog, and Hagels' testimony that Koch stated he represented Midwestern Homes at the first meeting, justified Hagels' belief that Koch was an agent for Midwestern Homes. Midwestern Homes did not take any affirmative action to point out that Koch was not an agent.

By applying the statutory provisions and case law cited earlier herein, we believe that the trial court did not give sufficient consideration to the atmosphere surround-

ing the transactions culminating in the execution of a single instrument for both the sale and construction of the home. We have difficulty in trying to separate the sale contract from the construction contract. We are convinced the trial court made a mistake in this respect. We therefore conclude that the trial court erred in determining that Midwestern Homes is not liable for Koch's failure to complete the construction of the home and in dismissing the complaint against Midwestern Homes.

Accordingly, that portion of the judgment dismissing the complaint and action against Midwestern Homes is hereby reversed and the case is remanded for the entry of judgment in the amount of $16,208.17 in favor of Gary M. Hagel and Susan I. Hagel and against Midwestern Homes, Inc., a division of Buckingham Wood Products Co., Inc., and Ed Koch, individually and as agent for Midwestern Homes.

ERICKSTAD, C. J., and PAULSON, PEDERSON, and VOGEL, JJ., concur.