TRANSAMERICA INSURANCE COMPANY, Plaintiff, Appellee, and Cross-Appellant,

v.

STANDARD OIL COMPANY (INDIANA), d/b/a Amoco Oil Company (Maryland), Defendant, Appellant, and Cross-Appellee.

Civ. No. 10175.

Supreme Court of North Dakota.

Oct. 20, 1982.

Robert S. Rau and Gary H. Lee, of Bosard, McCutcheon & Rau, Minot, for plaintiff, appellee, and cross-appellant; argued by Robert S. Rau, Minot.

B. Timothy Durick and Joy L. Wezelman, of Pearce, Anderson & Durick, Bismarck, for defendant, appellant, and cross-appellee; argued by B. Timothy Durick, Bismarck.

VANDE WALLE, Justice.

Robert Smith, former office manager of Minot Builders Supply Association (hereinafter "MBS"), fraudulently used a credit card issued to MBS by Standard Oil Company of Indiana, doing business as Amoco Oil Company (hereinafter "Amoco"), for his personal gain. Because Transamerica Insurance Company (hereinafter "Transamerica") insured MBS for wrongful acts by MBS employees, Transamerica paid MBS for the loss caused by Smith's fraud. As a result Transamerica became subrogated to MBS's claims. Transamerica brought an action against Amoco alleging that it was not liable for Smith's fraudulent charges under Federal and State credit-card laws. The district court of Ward County agreed and awarded Transamerica $26,376.53 plus costs. We reverse and remand for a reconsideration of the amount of damages consistent with this opinion.

In March 1967 MBS first obtained an Amoco credit card for use in its business. As office manager Smith's duties included requesting credit cards for MBS employees and paying bills. The cards were renewed periodically, and the charges were paid by MBS.

On May 16, 1975, Smith made a written request to Amoco for a Torch Club credit card. A Torch Club credit card is comparable to a Diner's Club card because it may be used for purchases of consumer goods and services other than those furnished at gasoline service stations. The Torch Club application was signed by Smith as office manager. It also contained the signature of Mr. Switzer as general manager and secretary-treasurer of MBS; however, the trial court determined that Mr. Switzer's signature was forged by Smith.

After receiving the application Amoco did not contact the credit references listed in the application letter or any officer of MBS. Amoco issued the Torch Club card after reviewing MBS's record of payment on its Amoco gasoline credit cards.

During the period from May 1975 until July 1978 Smith wrongfully and fraudulently used the Torch Club card to obtain goods and services in the amount of $26,376.53. MBS paid for these purchases with checks signed by Smith and an authorized officer. There is some indication that Smith forged a portion of the necessary second signatures and that he altered the records to cover his wrongful acts. During this time MBS employed accountant firms to perform annual audits, but they did not discover the fraud.

After Smith's dishonesty was revealed, he was fired. MBS's fidelity-bond carrier, Transamerica, paid MBS its claim in full for the loss caused by Smith's fraudulent acts. Transamerica brought an action against Amoco as a subrogee under MBS's claim, alleging that it was not liable for the charges under Federal and State credit-card law. The trial court ruled in favor of Transamerica, and Amoco appealed.

In addition to the appeal on the merits, Transamerica moved to strike designations of Amoco's appendix. The portion of the appendix Transamerica objects to is a partial transcript of *Transamerica v. Scheels Hardware,* a North Dakota district court case also involving embezzlement by Smith. The material objected to in Amoco's appendix by Transamerica was not considered by this court in its review of the merits. Transamerica's motion is denied.

■ In May of 1968 the Congress passed the Truth in Lending Act, 15 U.S.C. §§ 1601–1667e (1977), which requires that creditors disclose the true cost of consumer credit so that consumers can make informed credit decisions. 15 U.S.C. § 1601 (1977). In 1970 the Congress passed an amendment to the Truth in Lending Act to regulate the credit-card industry. 15 U.S.C. §§ 1602, 1642–1644 (1977). The amendment had three purposes—to prohibit the unsolicited distribution of credit cards [15 U.S.C. § 1642 (1977)], to make the fraudulent use of credit cards a Federal crime [15 U.S.C. § 1644 (1977)], and to limit cardholder liability to 50 dollars for the unauthorized use of a credit card [15 U.S.C. § 1643 (1977)].

The original Truth in Lending Act focused upon consumer transactions and exempted extensions of credit for business purposes. 15 U.S.C. § 1603(1) (1977). In 1974 the Congress added a section to the Act stating that the business exemption in § 1603(1) does not apply to the credit-card legislation in §§ 1642–1644. 15 U.S.C. § 1645 (1977). All credit cards, whether used for business or for consumer purposes, are covered by the 50-dollar limit in § 1643. See *Credit Card Service Corp.,* 495 F.2d 1004, 1008 (D.C.Cir.1974); *American Airlines, Inc. v. Remis Industries, Inc.,* 494 F.2d 196, 202 (2d Cir. 1974).

The version of 15 U.S.C. § 1643(a) (1977) in effect during the time of the transaction in issue is as follows:

"A cardholder shall be liable for the unauthorized use of a credit card only if the card is an accepted credit card, the liability is not in excess of $50, the card issuer gives adequate notice to the card-

holder of the potential liability, the card issuer has provided the cardholder with a self-addressed, prestamped notification to be mailed by the cardholder in the event of the loss or theft of the credit card, and the unauthorized use occurs before the cardholder has notified the card issuer that an unauthorized use of the credit card has occurred or may occur as the result of loss, theft, or otherwise. . . ."

The North Dakota Legislature also has enacted a credit-card statute, Section 51–14.1–02, N.D.C.C., which provides, in part:

"A provision imposing liability on a cardholder for the unauthorized use of a credit card shall be effective only if the card is an accepted credit card, the liability imposed is not in excess of one hundred dollars, the card issuer gives adequate notice to the cardholder of the potential liability, and the unauthorized use occurs before the cardholder has notified the card issuer of the loss or theft of the card or of any unauthorized use."

■ The requirements for imposing liability and the legislative purposes are similar in the Federal and State legislation. In the Federal statute, though, maximum cardholder liability is $50 while in the State statute the limit is $100. We will not apply State law in contravention of the Federal statute. See *Hickman v. Cliff Peck Chevrolet, Inc.,* 566 F.2d 44, 47 (8th Cir. 1977). Therefore, the Federal statute supersedes the State statute to the extent the provisions regarding the amount of maximum cardholder liability for an unauthorized use actually conflict. See, generally, 16 Am. Jur.2d, *Constitutional Law,* § 291 (1979).

■ In 15 U.S.C. § 1643(a) and Section 51–14.1–02, N.D.C.C., a cardholder is liable for a limited amount if certain conditions are met and if the use of the credit card was unauthorized. Accordingly, the initial determination is whether or not the use of the credit card in the case at hand was unauthorized. The Federal and State definitions of "unauthorized use" are identical: "a use of a credit card by a person other than the cardholder who does not have ac--

tual, implied, or apparent authority for such use and from which the cardholder receives no benefit." 15 U.S.C. § 1602(*o*) (1977); Sec. 15–14.1–01(7), N.D.C.C. The test for determining unauthorized use is agency, and State agency law must be used to resolve this issue.

■ Smith did not have actual or implied actual authority to request an Amoco Torch Club credit card. The trial court correctly determined that the doctrine of ostensible authority controls in this case. The party who alleges the existence of agency based upon ostensible authority—here, Amoco—has the burden of proving agency by clear and convincing evidence. *Farmers Union Oil Co. of Dickinson v. Wood,* 301 N.W.2d 129, 133 (N.D.1980).

■ "Ostensible authority" is also called "apparent authority" and it "is such as the principal [MBS] intentionally or by want of ordinary care causes or allows a third person [Amoco] to believe the agent [Smith] to possess." Sec. 3–02–02, N.D.C.C. MBS is bound by Smith's acts under ostensible authority only to third persons who have incurred a liability in good faith and without ordinary negligence. See. Sec. 3–03–03, N.D.C.C. The trial court determined that Amoco acted negligently by issuing MBS a Torch Club credit card without independently verifying Smith's authority. Because of this negligence the trial court determined that Amoco could not rely upon Smith's ostensible authority to establish the existence of agency.

■ The trial court's finding of fact that Amoco was negligent in issuing Smith the Torch Club card was not clearly erroneous. Credit-card issuers should make the necessary investigation prior to issuing a credit card. *First National City Bank v. Mullarkey,* 87 Misc.2d 1, 385 N.Y.S.2d 473 (1976). Amoco did not use the requisite reasonable diligence to ascertain whether or not Smith was acting within the scope of his authority. Therefore, Amoco is unable to rely upon the doctrine of ostensible authority when claiming Smith was authorized to request and use the Torch Club card.

In *Hagel v. Buckingham Wood Products,* 261 N.W.2d 869, 875 (N.D.1977), this court quoted 3 Am.Jur.2d, *Agency,* § 78, as follows: "[A] third person dealing with a known agent must bear the burden of determining for himself, by the exercise of reasonable diligence and prudence, the existence or nonexistence of the agent's authority to act in the premises." Smith's request for a Torch Club credit card was "unauthorized" under the Federal and State credit-card legislation.

■ A second requirement for imposing limited cardholder liability under Federal and State law is that the card must be an accepted credit card. An "accepted credit card" is any credit card which the cardholder has requested, signed, used, or authorized another to use for the purpose of obtaining money, property, labor, or services on credit. 15 U.S.C. § 1602(*l*) (1977); Sec. 51–14.1–01(1), N.D.C.C. In the case at hand, MBS did not sign, use, or authorize Smith to use the credit card. The trial judge's finding that the Torch Club card was not an accepted credit card belonging to MBS was not clearly erroneous.

■ Both the Federal and the State statutes provide that when all the statutory requirements for limited liability are not met, the cardholder incurs no liability based upon the unauthorized use of any credit card. 15 U.S.C. § 1643(d) (1977); Sec. 51–14.1–02, N.D.C.C. Because the Torch Club card issued to Smith was not an accepted card, MBS and its subrogee, Transamerica, are not liable for the initial fraudulent charges made by Smith.

■ However, the trial court erred in not looking beyond Amoco's negligence in issuing Smith the card. After receiving the first statement from Amoco containing the fraudulent charges, MBS was negligent in not finding and reporting the fraud. If the person to whom a credit card is issued is careless, he may be held liable. 50 Am. Jur.2d, *Letters of Credit,* § 39 (1970). For example, in *Martin v. American Express, Inc.,* 361 So.2d 597 (Ala.Civ.App.1978), a cardholder voluntarily permitted another

who was involved in a business venture with him to use his credit card. The court held that the limit on liability in 15 U.S.C. § 1643(a) was inapplicable to these facts for policy reasons. Otherwise, an unscrupulous cardholder could allow another to charge hundreds of dollars in goods and services and then attempt to limit his liability to 50 dollars.

■ The Federal Truth in Lending Act does not answer the question of whether or not cardholder negligence removes the statutory liability limit. See Weistart, *Consumer Protection in the Credit Card Industry: Federal Legislative Controls,* 70 Mich.L. Rev. 1476, 1526 (1972). We believe that MBS's negligence in not examining its monthly statements from Amoco removes this case from the statutory limit on cardholder liability.

A bank customer has a duty to examine his bank statement promptly, using reasonable care to discover unauthorized signatures or alterations. Sec. 41–04–33(1), N.D. C.C. If the bank uses reasonable care in making the statement and if the bank customer fails to examine his statement, the customer is precluded from asserting his unauthorized signature against the bank after a certain time. Sec. 41–04–33(2), (4), N.D.C.C.[1] This commercial-paper situation parallels the facts at hand. Amoco was not negligent in billing MBS. If someone at MBS other than Smith had examined its statements from Amoco, he would have discovered Smith's fraud. It was the responsibility of MBS to institute internal procedures for the examination of the statements from Amoco which would have disclosed Smith's defalcation. It was solely within MBS's power to do so.[2] The failure of MBS

to institute such procedures is the cause of that portion of the defalcation which occurred following the billing from Amoco which contained the first evidence of Smith's fraud.

■ Because of MBS's negligence, we will reexamine whether or not Smith acquired ostensible authority in his use of the Torch Club card after MBS became negligent. In *Farmers Union Oil Co. of Dickinson v. Wood, supra,* this court set forth the test to determine whether or not an ostensible authority existed. The authority must be based upon a principal's conduct which, reasonably interpreted, causes a third person to believe the agent has authority to act for the principal.

In *Hagel v. Buckingham Wood Products, Inc., supra,* 261 N.W.2d at 875, this court quoted with approval *McGee v. Breezy Point Estates,* 283 Minn. 10, 22, 166 N.W.2d 81, 89 (1969), as follows:

"[T]he scope of apparent [ostensible] authority is determined not only by what the principal knows and acquiesces in, but also by what the principal should, in the exercise of ordinary care and prudence, know his agent is doing.

"Thus, if a principal acts or conducts his business either intentionally or through negligence, or fails to disapprove of the agent's acts or course of action so as to lead the public to believe that his agent possesses authority to act or contract in the name of the principal, the principal is bound by the acts of the agent within the scope of his apparent authority as to persons who have reasonable grounds to believe that the agent has such authority and in good faith deal with him. 3 Am.Jur.(2d) Agency, § 74."

---

1. In *Thoreson v. Citizens State Bank,* 294 N.W.2d 397 (N.D.1980), an elevator manager's wife forged his signature on checks drawn on the Leeds Elevator checking account. This court determined that the elevator owner, Thoreson, did not act with reasonable care and promptness to discover the forged checks enclosed in the weekly bank statement and notify the bank. Because he did not act with reasonable care, Thoreson had the burden of proving that the bank did not exercise ordinary care in paying the forged checks in issue.

2. In *Van Gohren v. Pacific National Bank of Washington,* 8 Wash.App. 245, 505 P.2d 467 (1973), a bookkeeper embezzled company money by cashing forged checks, removing the canceled checks from the monthly bank statements, and altering the company books. Even a cursory look at the bank statements would have revealed the bank was charging the company's account for unauthorized checks. Discovery of the embezzlement was solely within the company's control.

Amoco was negligent in issuing Smith the Torch Club card and therefore Amoco initially could not rely on the doctrine of ostensible authority. However, during Smith's fraudulent use of the card, Amoco was not negligent. Rather, MBS was negligent in not requiring that someone other than Smith examine its monthly statements. Smith embezzled money from MBS for three years through his fraudulent use of the Torch Club credit card. During this lengthy period of embezzlement, MBS always paid its monthly bill to Amoco. MBS contends that it is not proper for the court to consider the fact that MBS paid all the Amoco credit card charges. That contention is without merit. As a result of MBS's acts of paying for the charges and its failure to examine its statements so that it could notify Amoco of the fraud, MBS allowed Amoco to reasonably believe that Smith was authorized to use the credit card.

MBS claims that it relied upon its accountants to find fraud during annual audits. MBS made the decision to hire and rely upon accountants. This decision does not protect MBS from the inability of these accountants to discover the fraud.

 We conclude that Amoco is liable for Smith's fraudulent purchases from the time the credit card was issued until MBS received the first statement from Amoco containing Smith's fraudulent charges plus a reasonable time to examine that statement. After that time, MBS's subrogee, Transamerica, is liable for the remaining fraudulent charges. We reverse the judgment and remand this case for a determination of when MBS should have examined its statements and discovered Smith's fraud, and, consistent with this opinion, for a new calculation of the damages.

ERICKSTAD, C.J., and SAND and PAULSON, JJ., concur.

PEDERSON, Justice, concurring and dissenting.

I agree that the judgment should be reversed but I do not agree that the remand should be for the purpose of recalculation of the damages. On remand, the judgment should be entered for Amoco.

The application for the Torch Club credit card was made by Smith, office manager, whose authority to do so is questioned, and by Switzer, secretary-treasurer, whose authority to do so is not questioned. It is noted that Switzer testified that he was the general manager.

The court made no findings of fact as contemplated by Rule 52(a), N.D.R.Civ.P., but if we search hard enough and use our imagination, in the court's memorandum opinion we find what appears to be a finding of fact that the application for the Torch Club credit card "carried the forged signature of Mr. Switzer." That is a controlling question in this case. As a finding of fact, it is unsupported by any substantial evidence and that makes it "clearly erroneous."

Switzer testified on direct examination as follows:

"Q [by Mr. Rau] Does that appear to be your signature on this letter?

"A [by Mr. Switzer] That is very like my signature, *yes.*" [Emphasis added.]

On cross-examination Switzer testified:

"Q [by Mr. Durick] I am just wondering. I think signatures are quite personal and I know—I think I could identify mine.

"A [by Mr. Switzer] If this were handed to me and said, 'Is this your signature?' I would have to say it certainly looks like it, *yes.*" [Emphasis added.]

Then the judge inquired as follows:

"THE COURT: That is essentially what he is doing. In your opinion, I know you can't be totally certain, but you feel it is your signature?

"THE WITNESS: *Yes.*" [Emphasis added.]

Commenting on the holding in *Verry v. Murphy,* 163 N.W.2d 721 (N.D.1969), this court said in *Malarchick v. Pierce,* 264 N.W.2d 478, 480 (N.D.1978), that:

"We believe, however, that testimony unfavorable to one's own contention can be a 'judicial admission' if it is 'deliberate, clear and unequivocal.' "

The fact that other witnesses may have said that this was a forged signature does not reduce Switzer's answers to something less than a judicial admission. I do not agree that either the federal statute (15 U.S.C. 1643) or the state statute (§ 51–14.-1–02, NDCC) has any bearing on this case.